Harold L. STEPHENSON; Marie Lohse; Joseph Ventimiglia; and Dorothy Petrowicz, Plaintiffs–Appellants,

v.

Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant–Appellee.

No. 95–15729.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1996.

Decided June 25, 1996.

Carol S. Jimenez, Center for Health Care Rights, Los Angeles, California, for plaintiffs-appellants.

Lois B. Osler, United States Department of Justice, Washington, D.C., for defendant-appellee.

Before HALL and BRUNETTI, Circuit Judges, and WEINER,* District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:.

We must decide whether the Medicare Act, in sections found at 42 U.S.C. §§ 1395cc(a)(2)(A), 1395u(b)(3), 1395x(v)(1)(K), compels the Secretary of Health and Human Services to impose a cap on hospital outpatient charges. We conclude that it does not, and affirm the order of the district court.

## I

The appellants are a certified class of Medicare beneficiaries. They brought this action alleging that the Secretary had violated various provisions of the Medicare Act, the Administrative Procedure Act and the Constitution. All of their claims were dismissed, except for those based upon a violation of the Medicare Act. The Medicare Act claims were dismissed separately in an order granting summary judgment for the Secretary. We now consider this order alone. The question presented is whether the Medicare Act requires hospitals to charge no more than a "reasonable" amount for services rendered under Medicare's "Part B." The appellants seek an order compelling the Secretary to ensure that hospitals comply with this command.

Medicare is a vast and complicated federal program. Congress established the Medicare program in 1965 to provide "Federal Health Insurance for the Aged and Disabled." Title XVIII of the Social Security Act of 1965, codified as amended at 42 U.S.C. §§ 1395c *et seq.* Medicare is administered by the Secretary of Health and Human Services ("HHS"), who delegates administrative responsibility to the Health Care Financing Administration ("HCFA"). To be eligible for Medicare, an individual must normally be at least 65 years old or subject to certain disabilities. *See* 42 C.F.R. § 407.10.

The program consists mainly of two parts. "Part A" provides an insurance plan to cover inpatient hospital, nursing home, hospice and at-home care. 42 U.S.C. § 1395d(a). Part A is an entitlement for which eligible beneficiaries need not pay premiums; it is financed by payroll taxes. Part A is not at issue in this lawsuit. "Part B," the subject of this lawsuit, provides coverage for certain physi-

* Hon. Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsyl- vania, sitting by designation.

cian and hospital outpatient services not covered by Part A. 42 U.S.C. §§ 1395j to 1395w–4 ("Supplemental Insurance for the Aged and Disabled"); *see also* 42 U.S.C. § 1395d (scope of benefits). To deliver Part B services, the HCFA enters into contracts with health care providers, 42 U.S.C. § 1395cc, such as the hospitals whose outpatient bills gave rise to this suit.

The cost of Part B services is shared by beneficiaries and the government. To obtain coverage, Medicare-eligible individuals must first enroll in the program. 42 U.S.C. §§ 1395o (eligibility), 1395p (enrollment). Next, they pay monthly premiums, an annual deductible, and additional fees per-service, called, "coinsurance" or "copayments". 42 U.S.C. §§ 1395r, 1395s (premiums), 1395cc (coinsurance); 42 C.F.R. § 410.160(f) (1995) (deductible). Finally, the HCFA reimburses the balance of the costs of Part B from a "Federal Supplementary Medical Insurance Trust Fund." 42 U.S.C. § 1395l; *see also* § 1395t (describing trust fund). Patients are considered the "beneficiaries" of this trust. Statutes and HHS regulations determine how much the government and the beneficiaries pay, according to formulas which vary with the type of service covered.[1]

At the center of this case is a fight over cost-sharing and, in particular, how much of the cost beneficiaries should be responsible for. According to the basic formula for Part B services, a beneficiary must pay 20% of the

> *reasonable charges* for such items and services (not in excess of [20%] of the amount customarily charged for such items and services by such provider).

42 U.S.C. § 1395cc(a)(2)(A)(ii) (1995) (emphasis added). The federal government pays

> the lesser of (I) the *reasonable cost* of such services . . . or (II) the customary charges . . . but in no case may the payment . . . exceed 80 percent of such reasonable cost.

42 U.S.C. § 1395l(a)(2)(B)(i) (1995) (emphasis added). The appellants call this cost-sharing arrangement the "80–20 split." It guarantees health services providers payment for 100% of their Medicare-allowed costs. *Pennsylvania Medical Soc. v. Snider*, 29 F.3d 886, 892 (3d Cir.1994); *New York City Health & Hosp. v. Perales*, 954 F.2d 854, 858 (2d Cir. 1992).

However, the label "80–20 split" is misleading. Of the total amount *paid to the provider*, the beneficiary's share typically exceeds 20%, while the government's share falls below 80%. This is true for several reasons. First, note that the HCFA reimburses on the basis of the hospital's *costs*, while the beneficiary owes a percentage of hospital *charges*. Because providers normally charge above cost—this is how they make money—we should expect the beneficiary's share to represent something more than 20% of the total payment to the hospital.[2] Just how much more than 20% depends upon the degree to which charges exceed costs.

In recent years, charges have far exceeded costs and, as a result, copayments have risen. It is the burden of coping with rising copayments that animates this lawsuit. In the early days of Medicare, according to the Secretary, charges approximated costs. Since the early 1980s, however, hospitals have raised charges for outpatient services well above their costs, allegedly in an attempt to compensate for revenues lost in other areas of their business, where Congress and the insurance industry have imposed cost controls. Outpatient charges (and coinsurance) have risen steeply, at a rate faster than the rate for many other medical services.

Costs, meanwhile, have not risen as fast, and this has further reduced the government's burden under Part B. The federal government has, by statute and regulation,

---

**1.** Some medical procedures receive greater subsidy than others. *See* 42 U.S.C. § 1395l (containing reimbursement formulas for various services).

**2.** To illustrate, assume the beneficiary has paid his premiums and met his annual deductible. Thereafter, the HCFA might pay a portion of his medical bills as follows:

1. The amount charged is $100.
2. The beneficiary's copayment will be .20 × 100 = $20.
3. Costs are $75.
4. Medicare's share is .80 × 75 = $60.
5. Total payment to the hospital is 20 + 60 = $80.
6. The beneficiary's share is 20 / 80 = 25%.

imposed progressively tighter limits on what "costs" will be deemed "reasonable" for purposes of reimbursement.[3] The combined effect of rapidly rising charges together with deliberate cost controls has been to inflate the percentage of total hospital receipts paid by beneficiaries.

Yet another source of inflationary pressure on coinsurance comes from so-called "formula-driven overpayment." *See* Donna E. Shalala, Secretary of Health and Human Services, *Report to Congress: Medicare Hospital Outpatient Prospective Payment* iv (1995) ("Secretary's *Report*"). Since the passage of the Omnibus Reconciliation Act of 1986, Pub.L. No. 99–509, 100 Stat. 1874 (1986) ("OBRA 1986"), the HFCA has applied a complicated formula to pay hospitals for many outpatient diagnostic and surgical procedures. *See, e.g.,* 42 U.S.C. § 1395*l*(n) (applying new formula to reimbursement for radiology diagnostic). This formula, known as the "blended rate," permits hospitals in certain circumstances to recover more than 100% of their Medicare-allowed costs by overcharging beneficiaries; thus the "blend" gives hospitals an incentive to raise their outpatient charges. Secretary's *Report* iv; United States General Accounting Office, *Medicare: Alternatives for Computing Payments for Hospital Outpatient Surgery* 3

(1990). Before the blended rate was adopted, the system discouraged hospitals from overcharging beneficiaries by offsetting overpayment by the beneficiary with a corresponding reduction in the amount paid by the HCFA.[4]

As a result of these and other influences, beneficiaries now pay some 49% of the total reimbursement to hospitals for Part B services.[5] Secretary's *Report* 29. This condition grows more acute with time. The Secretary estimates that by the next century Medicare beneficiaries will be paying 65% of total Part B hospital receipts. *Id.* In response to this worrisome trend, and to keep the system solvent, Congress is presently studying new ways to finance Medicare. In particular, Congress is looking into a "prospective payment"[6] system for hospital outpatient services. *See* Secretary's *Report;* Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 4151(b)(2), 104 Stat. 1388, 1388–72 (1990), codified at 42 U.S.C. § 1320b–5 note ("OBRA 1990") (directing Secretary to study feasibility of prospective payment system for hospital outpatient services).

■ In the meantime, we are left to decide what controls the present Medicare legisla-

---

3. For example, in 1981 and 1982, Congress tightened the criteria which determine Medicare-allowable costs and charges in the context of outpatient services. *See* Medicare Program; Limitation of Reasonable Charges for Services in Hospital Outpatient Settings, 47 Fed.Reg. 43610, 43610 (1982) (discussing Omnibus Budget Reconciliation Act of 1981, which requires regulations to govern Medicare-allowable costs, and Tax Equity and Fiscal Responsibility Act of 1982, which disallows charges for physician's overhead expenses when physician operates in a hospital setting).

Also, the HCFA refuses to reimburse at rates beyond those "customary" for a given area. *See* 42 C.F.R. § 405.502 (for physicians, reimbursement based on customary charges); *see also,* § 413.5 (for hospitals, reimbursement based on customary costs).

4. To illustrate:
    1. The charge for an outpatient surgical procedure = $2000.
    2. Beneficiary's coinsurance = 20% × 2000 = $400.
    3. Medicare-allowed (according to a formula) costs = $1400.

4. Costs—coinsurance = 1400—400 = $1000.
    5. HCFA pays 1000.
    6. Hospital receives 1000 + 400 = 1400 (i.e., the Medicare-allowed amount).

Under this system, line 3 always equals line 6: say charges rose to $3000 while costs remained constant. The beneficiary would now owe 20% (i.e., $600), but this amount would be deducted from the government's obligation in line 4 (1400—600 = $800). Therefore, the hospital would receive $1400 and no more, regardless how much it charged the beneficiary. This removed one incentive to raise outpatient charges.

5. The Secretary notes in her Report, however, that most copayments are covered by private supplemental insurance, known as "Medigap" policies. Secretary's *Report* 24. Coinsurance inflation is thus most troublesome for the 20% of patients who have neither private insurance nor Medicaid.

6. "Prospective payment" is Medicare jargon for a schedule of set reimbursement amounts corresponding to specific services and procedures.

tion exerts on coinsurance. We review de novo the district court's order upholding the Secretary's interpretation of the Social Security laws. *Regents of the Univ. of Cal. v. Heckler,* 771 F.2d 1182, 1187 (9th Cir.1985).

## II

The beneficiaries first argue that 42 U.S.C. § 1395cc(a)(2)(A) (Supp.1995) ("section 1395cc") imposes two, independent caps on hospital charges under Part B, and that the Secretary has failed to enforce these limits. The beneficiaries read "reasonable, not to exceed customary" as equivalent to "reasonable *and* customary." In their view, the Secretary should take steps—by regulation, contract compliance monitoring, or otherwise—to guarantee that all Part B hospital agreements enforce this statutory limit on coinsurance.[7]

The district court rejected this reading of the statute on the grounds that section 1395cc does not explicitly direct the Secretary to "regulate" hospital charges to Part B patients. However, we find this rationale somewhat unsatisfying.[8] Section 1395cc appears to be self-executing, even without language instructing the Secretary to promulgate regulations. This section regulates the terms under which the HCFA may contract with providers to deliver Part B services. If the beneficiaries are correct in their interpretation of the statute, then the Secretary is bound by law to include a "reasonable and customary" limitation in every contract executed under the authority of section 1395cc.

■ The Secretary defends herself on three grounds. First, she disagrees with the beneficiaries' reading of the statute. In her view, section 1395cc permits hospitals to calculate copayments on the basis of any amount up to their customary charges. In effect, she reads "customary" as *synonymous* with "reasonable." Normally, we defer to an executive agency's expert interpretation of its enabling legislation when the agency's view is reasonable and consistent with the statute's plain language, whether or not we would have made the same decision were we standing in the agency's shoes. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Here, however, the question is close. The beneficiaries seem to have offered the better semantic reading while the Secretary speaks from a position of superior expertise. We prefer not to choose between these positions, and happily, we are not required to do so.

Second, the Secretary contends that whatever reading is given to the statute, we should deny the appeal because the beneficiaries have failed to demonstrate that the HFCA in practice permits either "unlimited" or "unreasonable" charges to Part B patients. But the beneficiaries have offered evidence. First, they point out that no regulation defines either "reasonable" or "customary" for the purposes of outpatient charges under Part B.[9] Then, they present to us statements by Medicare officials purporting to represent a policy not to control outpatient charges.[10] They also offer a Medicare Intermediary Manual which supports the proposition that billed charges *may* be considered reasonable. Finally, the beneficiaries con-

---

7. Here we address what one might call the "nonspecific" version of the beneficiaries' argument: "reasonableness must mean *something,* it must be given some teeth." At times the beneficiaries argue for a "specific" form of this argument, namely, that beneficiaries should never be required to pay more than 20% of the amount hospitals *receive.* By rejecting the nonspecific version, a fortiori we reject the specific.

8. This is no criticism of the district court. The district court took its cue from the beneficiaries themselves in giving this section of their argument cursory treatment. In the proceedings below, the beneficiaries focused their attention on the issues we address in Part III of this opinion.

9. Although regulations do define those terms for the purpose of reimbursement by the HCFA. *See* 42 C.F.R. §§ 405.501—405.503 (1995).

10. *See* Secretary's *Report* (cover letter stating "[c]urrent law requires that beneficiaries pay 20 percent of submitted charges"). They also offered a letter from a Vice–President for Medicare Part A, which stated, "[n]either the intermediary nor the Health Care Financing Administration has the legal authority to impose charge structure on the provider community. Since there are no restrictions on the amount that a hospital charges, we cannot interfere in the amount that is billed."

tend, albeit without real evidence,[11] that the HCFA permits hospitals to depart from customary charges and engage in price discrimination for outpatient services. The district court made no findings on these difficult questions of fact. Because we accept the Secretary's third argument, we decline to reach the issue ourselves.

■ Third, the Secretary contends that whatever the original meaning of "reasonable not to exceed customary," Congress has in any event acquiesced to the Secretary's consistently held view that section 1395cc requires no action on her part to limit outpatient charges under Part B. We believe this is correct. Although reasonableness has long been a condition on Part B provider agreements, Congress has never specifically directed the Secretary to cap the charges for hospital outpatient services. *See Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801, 808 (9th Cir.1989) (Congress may be deemed to have acquiesced in agency interpretations of which it is aware when it amends the statute in question.); *Blackfeet Tribe v. State of Mont.,* 729 F.2d 1192, 1202–03 (9th Cir.1984) (en banc) (same); *but see, Mayburg v. Sec'y of Health and Human Services,* 740 F.2d 100, 104–05 (1st Cir.1984) (Mere Congressional inaction, without corroborating evidence of intent to acquiesce, does not support an agency's erroneous interpretation.) (citing cases).

The record amply demonstrates Congress' awareness of both the cost-shifting problem and the Secretary's failure to "correct" it. The Secretary herself brought these matters to Congress' attention in her 1995 report entitled "Medicare Hospital Outpatient Prospective Payment." In it she discussed the rapid inflation of hospital charges to outpatients in recent years, due to the fact that Congress has capped reimbursement in other areas, and due to the institution of "blended rate" formula-driven overpayment. We further note that Congress itself has tinkered extensively with Medicare's finances over the last 15 years.[12] The principal goal of these enactments has been to reduce federal expenditures, and as a result Congress has never directed the Secretary to limit beneficiary copayments. This leads us to conclude that Congress is aware of the issue—indeed Congress may have caused the problem by introducing prospective payment for some services but not others—and that Congress has deliberately declined to address it.

Furthermore, permitting outpatient charges to rise is consistent with Congress' goal of encouraging a diversion of resources towards outpatient treatment. *See* 47 Fed. Reg. 43610, 43611–12 (indicating that Congress intended to encourage outpatient surgery as a cost-effective alternative to hospitalization). By increasing the rate of return to outpatient vis-a-vis inpatient procedures, Congress effectively increased the incentive to supply outpatient services.

Finally, we note that Congress has in other contexts invented mechanisms that if applied to hospital outpatients could reduce their medical costs. *See, e.g.,* 42 U.S.C. § 1395e(a)(1) (regulating certain coinsurance payments required of hospital *in*patients). Congress could deploy these cost-cutting

---

**11.** They merely cite *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* — U.S. —, —, 115 S.Ct. 1671, 1674, 131 L.Ed.2d 695 (1995) as authority for the proposition. But this case discusses a New York state policy which may permit price discrimination; it says nothing about HCFA policy or the pricing structure of health care outside New York.

**12.** See, e.g., Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 104, 96 Stat. 324, 336 (1982), codified as amended at 42 U.S.C. § 1395u (eliminating Medicare's "duplicate overhead payments for outpatient services"); Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2303, 98 Stat. 494, 1064 (1984), codified as amended in various subsections of 42 U.S.C. § 1395 (addressing Medicare's reimburse-

ment for diagnostic laboratory services for hospital outpatients); OBRA 1986, § 9343, 100 Stat. at 2039, codified as amended at 42 U.S.C. § 1395*l* (establishing "blended rate" reimbursement by Medicare for certain outpatient surgical procedures); Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, §§ 4062, 4066, 101 Stat. 1330, 1330–100, 1330–112 (1987), codified as amended at 42 U.S.C. §§ 1395m, 1395*l* (addressing reimbursement by Medicare for durable medical equipment, prosthetics, orthotics and radiology diagnostic services to outpatients); OBRA 1990, § 4163, 104 Stat. at 1388–96, codified at 42 U.S.C. § 1395x (addressing Medicare's reimbursement for outpatient mammography screening).

356

techniques more widely if it chose to do so. For example, Congress could compel hospitals to accept "assignment."[13] Or it could establish a prospective payment schedule for outpatient services, and reformulate copayments as a percentage of the prescribed fees. In fact, as we have discussed, Congress is presently studying the feasibility of a prospective payment system for hospital outpatient services, which could address the beneficiaries' concerns. *See* Secretary's *Report.* Thus, we decline the beneficiaries' invitation to preempt Congressional action in this very delicate area of public policy.

We are instead attentive to the advice of the Supreme Court, which reminds us that the Social Security Act is "Byzantine" and that, as a result, "Congress has conferred on the Secretary exceptionally broad authority to prescribe standards for carrying out certain sections of the Act." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). Medicare and Medicaid are enormously complicated programs. The system is a web; a tug at one strand pulls on every other. If we were to limit coinsurance, our decision might well reduce the total amount of money flowing into the system. *See* Secretary's *Report* ("Even incremental modifications in the coinsurance percentage can have substantial impacts on Medicare program expenditures."). In response, the federal government might be forced to make up the shortfall (in an era of declining budgets); or, alternatively, the supply of outpatient services might have to be rationed below current levels. Such thorny problems of resource allocation are best left to a publicly accountable Congress, and its agent, the Secretary. Health care resources are too scarce and precious to be doled out by judges.

Congress is aware of the Secretary's interpretation of section 1395cc, has participated in creating the present structure for reimbursement, and is considering its own changes to the system at this time. We decline to intervene in this area lying well beyond the judicial ken.

### III

Next, the appellants argue that two other sections of the Medicare Act, 42 U.S.C. §§ 1395x(v)(1)(K)(i) and 1395u(b)(3), explicitly require the Secretary to issue regulations defining the amount hospitals may reasonably charge Medicare beneficiaries for Part B outpatient services. They argue as follows: under 42 U.S.C. § 1395cc(a)(2)(A), as discussed above, a provider of services under Part B may charge no more than 20% of the reasonable and customary charges for outpatient services. This section they read together with two others. Section 1395u(b)(3)[14] provides, in relevant part, that

[t]he amount of any charges for outpatient services which shall be considered reasonable shall be subject to the limitations established by regulations issued by the Secretary pursuant to section 1861(v)(1)(K) [codified at 42 U.S.C. 1395x(v)(1)(K)(i)].

Section 1395x(v)(1)(K)(i) is found in a section devoted to defining "reasonable costs." It provides, in relevant part, that:

[t]he Secretary shall issue regulations that provide, to the extent feasible, for the establishment of limitations on the amount of costs or charges that shall be considered reasonable with respect to services provided on an outpatient basis by hospitals (other than bona fide emergency services as defined in clause (ii)) or clinics (other than rural health clinics), which are reimbursed on a cost basis or on the basis of cost

**13.** In some situations a physician agrees to payment by "assignment," by which the beneficiary "assigns" to his provider the right to be reimbursed by the Medicare program. The assignee physician receives copayments which are capped at 20% of a Medicare-scheduled fee. *See American Academy of Ophthalmology, Inc. v. Sullivan*, 998 F.2d 377, 379 (6th Cir.1993) (explaining concepts of "assignment" and "participating physicians"). Patients served by "unassigned" physicians, on the other hand, pay 20% of that physician's charges, whatever they may be. The present case deals with unassigned benefits only.

**14.** The parties and the district court cite for this language section 1395u(b)(3)(L). The preferable view is that the language comes from section 1395u(b)(3) because It follows the semicolon which concludes subsection (L), and it is not indented, as subsections (A) through (L) all are.

related charges, and by physicians utilizing such outpatient facilities.

42 U.S.C. § 1395x(v)(1)(K)(i) ("section 1395x"). The appellants conclude from these statutes that the Secretary must promulgate regulations to ensure that hospital charges to beneficiaries are "reasonable." The Secretary disagrees, and again the question is whether the Secretary's interpretation is reasonable according to *Chevron*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694.

### A

■ *Section 1395x(v)(1)(K)(i)*. The government argues that the phrase "reasonable charges" refers only to those charges upon which Medicare bases its 80% reimbursement. According to this view, the term reasonable charges was never meant to refer to charges submitted to beneficiaries. The text of the statute and its legislative history support the reasonableness of this interpretation.

Although the text may be thought to admit of more than one interpretation, the Secretary's interpretation must be upheld if it is at least reasonable. Stripped to its bones, section 1395x provides that:

The Secretary shall issue regulations stating what is reasonable—

With regard to "*any* costs or charges" for outpatient services—

Submitted by those hospitals or clinics which are "*reimbursed* on a cost basis or on the basis of cost related charges"—

Or by the physicians who use their facilities.

The appellants rightly point out that the statute addresses "any" charges by hospitals. This might be thought to cover charges to patients. However, the statute just as clearly modifies "hospital" by a clause discussing the manner of *reimbursement*. The Secretary could reasonably conclude from this clause that the aim of the statute is to regulate payments by the HCFA rather than payments by the beneficiaries. Historical context and legislative history confirm the reasonableness of this interpretation.

Section 1395x was enacted as part of the Omnibus Budget Reconciliation Act of 1981,

Pub.L. No. 97–35, § 2142(a), 95 Stat. 357, 798 (1980) ("OBRA 1981"), codified at 42 U.S.C. § 1395x. At that time, the HCFA reimbursed for hospital services on the basis of cost. *See* 42 U.S.C. § 1395x(a)(2)(B)(i) (1981). For clinics, reimbursement amounts were a function of cost-related charges (a "cost related basis"). *See* S.Rep. No. 139, 97th Cong., 1st Sess., 465, U.S.Code Cong. & Admin.News 1981, p. 731. And for physicians, the basis was their charges. *See* 47 Fed.Reg. at 43610; 42 U.S.C. § 1395u(b)(3) (1981). The appellants present no evidence to dispute this. Thus, it is reasonable to conclude that when Congress directed the Secretary in section 1395x to control "charges," it meant to capture *physicians'* charges only, and not hospital charges.

■ The Secretary's contemporaneous interpretation of OBRA 1981 is entitled to particular deference. *Wilshire*, 881 F.2d at 808. As the discussion published with the proposed regulations bears out, the Secretary regarded section 1395x as a mandate to develop regulations to save the government money. 47 Fed.Reg. at 43610. It was never suggested that the statute should be read to call for the regulation of beneficiary copayments.

The beneficiaries concede in their briefs that Congress enacted section 1395x as a cost-cutting measure. *See also, Edwards v. McMahon*, 834 F.2d 796, 801 (9th Cir.1987) (OBRA 1981's purpose was to reduce federal expenditures); H.R.Rep. No. 1167, 96th Cong., 2d Sess., 382, U.S.Code Cong. & Admin.News 1980, p. 5745; S. Rep. 139, *supra*, 430, 465; Conf. Rep. 208, 97th Cong., 2d Sess., 955; 47 Fed.Reg. at 43610. This supports the Secretary's interpretation that her duty was to limit the *government's* outlays for outpatient services. Limiting beneficiary copayments does not advance this purpose. Moreover, as the parties concede, copayment inflation was not yet an issue in 1981, so Congress had little reason to address it. The appellants maintain, however, that Congress had as a secondary goal the limiting of coinsurance. They produce no evidence to this effect and instead direct us back to section 1395cc's "reasonable limits" language. This language dates from the earliest years of

Medicare, and is weak evidence at best of Congress' intent in 1981, particularly because the appellants' interpretation of section 1395cc has never been officially followed.

Because the Secretary's interpretation of section 1395x is reasonable, we hold that she has not exceeded her statutory mandate.

## B

■ *Section 1395u(b)(3).* This was enacted as a companion provision to section 1395x. *See* OBRA 1981, § 2142(b), 95 Stat. at 798. Like section 1395x, it was intended to save money for the Medicare system. Thus it is unlikely that this statute was ever intended to address costs incurred by beneficiaries, as opposed to the government.

Likewise, the Secretary has from the beginning interpreted this statute as authority for regulations which limit physicians' charges to the extent that Medicare reimbursement was based on those charges. *See* 47 Fed.Reg. at 43610.

The only point of contention between the parties is whether section 1395u(b)(3) applies to charges by physicians only, or by hospitals as well. The appellants wish to read this statute as an independent directive to the Secretary to regulate hospital charges. This section reads, essentially, that:

The Secretary may enter into contracts with carriers to deliver services (§ 1395u(a))—

Each contract shall provide that the carrier agrees to abide by certain conditions (§ 1395u(b)(3))—

One such condition is that the carrier will assure that payments made on a charge basis are reasonable (§ 1395u(b)(3)(B))—

The Secretary will determine what is reasonable via regulations, as specified in section 1395x (i.e., the quoted language from § 1395u(b)(3))—

The appellants again point to the phrase "any charges" to support their argument that hospital charges are included. However, this statute discusses physicians throughout, and

not once mentions hospitals. In this context, "any charges" can reasonably be read to mean "any charges by physicians." It is reasonable to read this statute as simply ensuring that the mandate laid out in section 1395x applies to physicians who operate in the setting of a hospital outpatient department.

Thus, the Secretary's reading of this statute is reasonable, and we shall not disturb it.

## IV

While we are sympathetic to the plight of Medicare beneficiaries who are burdened by ever rising medical costs, we conclude that neither 42 U.S.C. § 1395cc(a)(2)(A), nor sections 1395u(b)(3) or 1395x(v)(1)(K), compel the Secretary to limit Part B outpatient charges. Accordingly, we affirm the order of the district court.

AFFIRMED.