**DAMERON PHYSICIANS MEDICAL GROUP, INC., et al., Plaintiffs,**

v.

**Donna SHALALA and S. Kimberly Belshe, Defendants.**

No. C 95–2999–CAL.

United States District Court, N.D. California.

Feb. 25, 1997.

---

Richard J. Stratton, Christopher J. Sundermeier, Bronson Bronson & McKinnon, San Francisco, CA, Samuel D. Orbovich, Orbovich & Gartner Chartered, St. Paul, MN, for Dameron Physicians Medical Group, Inc.

Richard J. Stratton, Christopher J. Sundermeier, Bronson Bronson & McKinnon, San Francisco, CA, for Bakersfield Memorial Ind. Practice Assoc., Emergency Physicians Medical Group.

Christopher J. Sundermeier, Bronson Bronson & McKinnon, San Francisco, CA, Thomas L. Skorczeski, Orbovich & Gartner Chartered, St. Paul, MN, for California Psychiatric Assoc., California Psychological Assoc., Eureka Internal Medicine, Matthew Zwerling, John R. Young, Karel M Kretzschmar, David W. Kent, Arthur A. Babad, Kevin L. Brink, Steven Fernandez, Michael A. Mundell, Paul J. Dennis, David C. Lyon, Lucius L. Button, Brian T. Marsh Clare Pearson, Irwin Barr, Michael N. Markopoulos, Phillip M. Pailey, Andrew G. Israel, Howard V. Williams, Donald J. Mangus, Michael W. Hoger, Neal Blumenfeld, Melody Chong, James Eichel, John Friedberg, Tom Genelli, Jack Hall, Robert Hanscom, Stephen Hart, Harry Kormos, Stephen Krause, Frank Massey, Sharon J. Nichols, Jonathan Noble, MD, Lawrence Novis, Steven J. Rosenthal, Herta Silzer, James Spaulding, Anthony Cosentino, Phillip Strauss, Mary Ann Vigilanti, Robert A. Mott, Michael Z. Prymoski, A. James Fisher.

Carol J. Federighi, U.S. Dept. of Justice, Civ. Div., Washington, DC, for Donna E. Shalala.

Ralph M. Johnson, CA State Atty. Gen. Office, San Francisco, CA, for S. Kimberly Belshe.

## OPINION AND ORDER FOR SUMMARY JUDGMENT

LEGGE, District Judge.

Plaintiffs, a group of California doctors, psychiatrists, psychologists, and other health care providers, bring this action under 42 U.S.C. § 1983 against defendants the Secretary of the United States Department of Health and Human Services ("HHS") and the Director of the California Department of Health Services ("DHS"). Plaintiffs contend that California's policy of "capping" reimbursements at the Medi–Cal limits violates federal law because health care providers receive less than the amount required by the federal Medicare statutes.

Defendants move for summary judgment that California's system for reimbursing health care providers does not violate the Medicare or Medicaid statutes. Plaintiffs cross-move for summary judgment that California may not "cap" its payments to health care providers at levels below those established by the Medicare system. The parties filed briefs in support of their motions, oppositions to the opposing parties' motions, and reply briefs in support of their own motions. This court heard oral argument on these motions and took them under submission. The issues in these cross-motions present only issue of law, and there are no genuine issues of material fact.

## I.

Under the Medicaid Act, a state must share certain expenses for qualified Medicare beneficiaries (QMB's) in order to make these QMB's eligible for Medicare Part B benefits. California participates in the Medicaid program as "Medi–Cal." Medi–Cal limits California's contributions under Medicare Part B so that the total reimbursements to a health care provider do not exceed the amounts that the provider would have received for the services under Medi–Cal alone.

Resolving the issues to determine whether California can cap its contributions under Medicare Part B requires interpreting the statutory provisions governing Medicare and Medicaid, which "are among the most completely impenetrable texts within human experience." *Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski,* 42 F.3d 1444, 1450 (4th Cir.1994), *cert. denied* —— U.S. ——, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995).

### A.

Eligibility for benefits under the Medicare Act, 42 U.S.C. §§ 1395–1395ccc, is based on old age or disability. An individual must be at least 65 years old or disabled to be eligible. 42 U.S.C. § 426 (1996). Medicare Part B provides optional insurance for medical benefits and requires the insured to pay a premium. Under Part B, Medicare pays 80% of "reasonable charges" and the patient pays the remaining 20%, which is referred to as the "copayment" or "coinsurance." Under the Medicare Act, the HHS Secretary is authorized to determine the reasonable costs or charges for Medicare Part B services. 42 U.S.C. § 1395w–4(b) (1996).

The Medicaid Act, 42 U.S.C. § 1396 *et seq.,* established the Medicaid program, a federal-state program providing medical benefits for indigents. Among other things, Medicaid pays for Medicare Part B premiums, deductibles and copayments for certain people too poor to afford this coverage. As stated, "Medi–Cal" is California's Medicaid program.

A QMB is either a person who qualifies for both Medicare and Medicaid ("dual eligibles"), or a person who qualifies for Medicare, is below the federal poverty level, but is not poor enough to qualify for Medicaid ("pure QMBs").

Medicare Part B benefits also cover some Medi–Cal patients. When this occurs, Medicare Part B pays 80% of the "reasonable" charge for the services and Medi–Cal pays some or all of the remaining 20% directly to the provider. The patient pays either nothing or a nominal charge. However, Medi–Cal often pays less than the remaining 20%, because the DHS has established maximum charges for each medical service covered by Medi–Cal. If the Medi–Cal maximum is less than the "reasonable charge" set by Medicare, Medi–Cal pays only the difference between what Medicare paid and the Medi–Cal maximum. As a result, the health care provider's total compensation is capped by the Medi–Cal maximum, which is less than the "reasonable charge" set by Medicare.

### B.

Plaintiffs contend that federal law requires Medicaid states to pay the full 20% of the federally allowed amount, so that health care providers receive 100% of the Medicare "reasonable" charges for their services. Defendants contend that California's payment cap is allowed by federal law.[1]

## II.

The primary issue is whether federal law requires Medi–Cal to pay the full difference between the Medicare Part B payments and the "reasonable" charge for the medical services determined by Medicare. The Ninth Circuit has not addressed this issue.

### A.

The statutory language is the starting point for interpretation. If the language of the statute is clear, then that is the end of the inquiry and a court need not defer to a federal agency's contrary interpretation of

---

**1.** Plaintiffs also argue that California must pay 50% of the total expenses incurred for outpatient mental health services, rather than 12.5% as asserted by defendants. This is a separate issue discussed below in Section V.

the statutory scheme. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The Medicare Act requires the federal government to pay:

> in the case of each individual who is covered under the insurance program established by this part and incurs expenses for services with respect to which benefits are payable under this part, amounts equal to. (1) in the case of services described in section 1395k(a)(1) of this title—*80 percent of the reasonable charges for the services* . . . .

42 U.S.C. § 1395*l*(a) (1996) (emphasis added).

The same Act provides:

> A provider of services may charge such individual or other person (i) the amount of any deduction or coinsurance imposed pursuant to 1395e(a)(1), (a)(3), or (a)(4), section 1395*l*(b) or section 1395x(y)(3) of this title with respect to such items and services (not in excess of the amount customarily charged for such items and services by such provider), and (ii) *an amount equal to 20 per centum of the reasonable charges for such items and services (not in excess of 20 per centum of the reasonable charges for such items and services by such provider)* for which payment is made under part B of this subchapter or which are durable medical equipment furnished as home health services. . . .

42 U.S.C. § 1395cc(a)(2)(A) (1996) (emphasis added).

Under the Medicaid Act:

> (a) A State plan for medical assistance must—
>
> (10) provide—
>
> (E)(i) for *making medical assistance available for medicare cost-sharing* (as defined in section 1396d(p)(3) of this title) for qualified medical beneficiaries described in section 1396d(p)(1) of this title; . . . .

42 U.S.C. § 1396a(a)(10)(E) (1996) (emphasis added).

Finally, under that Act:

> The term "medicare cost-sharing" means the following costs incurred with respect to a qualified medicare beneficiary . . . :
>
> (A) [Premiums under Part B] . . .
>
> (B) [Coinsurance under Part B] . . .
>
> (C) [Deductibles under Part B] . . .
>
> (D) The difference between the amount that is paid under section 1395*l*(a) of this title and the amount that would be paid under such section if any reference to "80 percent" therein were deemed a reference to "100 percent."

42 U.S.C. § 1396d(p)(3) (1996).

### B.

According to plaintiffs, the provider of Medicare services is entitled to recover 80% of its reasonable charge from the federal government under 42 U.S.C. § 1395*l*(a), and the remaining 20% from the patient under § 1395cc(a)(2)(A). Plaintiffs argue that under § 1396a(a)(10)(E) a state medicaid plan "must . . . provide . . . for making medical assistance available" for Medicare cost-sharing, and that under § 1396d(p)(3) cost-sharing by the states under Medicaid means paying the difference between 80% and 100% of the reasonable charges for services as determined by the HHS Secretary.

Defendants point to section 1396a(n) of the Medicaid Act, which provides that:

> In the case of medical assistance furnished under this subchapter [Medicaid] for medicare cost-sharing respecting the furnishing of a service or item to a qualified medicare beneficiary, the State plan [Medi–Cal] *may* provide payment in an amount with respect to the service or item that results in the sum of such payment amount and any amount of payment made under [Medicare] with respect to the service or item exceeding the amount that is otherwise payable under [Medi–Cal] for the item or service for eligible individuals who are not qualified medicare beneficiaries.

42 U.S.C. § 1396a(n) (1996) (emphasis added).

Defendants argue that this section uses the permissive "may" instead of the mandatory "must," and therefore allows *but does not require* a state plan such as Medi–Cal to

reimburse care providers at levels higher than the Medi–Cal payment cap. The reciprocal inference is that they may also pay providers the amount determined under Medi–Cal, even if this amount is less than the "reasonable" amount determined under Medicare Part B.

### C.

In the face of section 1396a(n), this court cannot say that the statutes unambiguously support plaintiffs' interpretation. In fact, this court finds it implausible that Congress would tell states that they "may" exceed their Medicaid caps for QMB's, if in fact Congress meant that they "must" pay the full 20% of the reasonable charges, even if that means exceeding the state's Medicaid payment cap.

Plaintiffs offer several other interpretations of § 1396a(n). First, plaintiffs assert that § 1396a(n) allows states to deviate from their federally-mandated payment schedules so that states can comply with the supposed requirement to pay 100% of Medicare's reasonable charges for QMBs. But if this were the intent of Congress, § 1396a(n) would not have used the permissive "may."

Second, plaintiffs argue that § 1396a(n) allows states to pay health care providers more than the Medi–Cal rate. The section does not, however, require states to pay 100% of Medicare reasonable charges, even if they exceed Medi–Cal reasonable charges; it merely says that a state may pay more for QMBs than for other aid recipients.

Third, plaintiffs argue that the permissive language allows states to impose a nominal charge on QMBs (such charges are permitted by other sections of the statute), which could result in higher payments for services for QMBs than for non-QMB aid recipients. While the permissive language would arguably allow this, there is no indication that this was the purpose of § 1396a(n).

The court in *Kozlowski* stated that § 1396a(n) is susceptible to at least three interpretations: (1) that the permissive "may" signals that states are authorized, but not required, to pay Medicare cost-sharing above Medicaid rates; (2) that the permissive

"may" is simply a lifting of a barrier imposed by Medicaid rates, which in conjunction with § 1396a(a)(10)(E)(i) and § 1396d(p)(3), requires States to pay Medicare cost-sharing in full; and (3) that § 1396a(n) authorizes a state to pay more for Medicare eligibles who are not eligible for Medicaid benefits but who meet certain criteria of poverty than for dual eligibles. *Kozlowski*, 42 F.3d at 1454.

Although the language of section § 1396a(n) does not definitively resolve all of the possible interpretations, it does support defendants' argument that states may cap payments to providers at the lower Medi–Cal rates.

Four Circuit Courts which have examined the issue have sided with plaintiffs. But three of those cases reversed contrary decisions by district courts and two of them contained dissents. *See Haynes Ambulance Service, Inc. v. State of Alabama*, 36 F.3d 1074 (11th Cir.1994); *Pennsylvania Medical Soc. v. Snider*, 29 F.3d 886 (3rd Cir.1994); *New York City Health & Hosps. Corp. v. Perales*, 954 F.2d 854 (2d Cir.), *cert. denied* 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992); *Kozlowski*, 42 F.3d 1444. These cases are discussed in section IV below.

In the absence of controlling authority in this circuit, this court cannot conclude that the statutory language is so clear that further aids to statutory interpretation are unnecessary.

### III.

If the meaning of a statute is not clear, courts must defer to a reasonable interpretation of the statute by the federal agency charged with implementing it. The United States Supreme Court stated in Chevron that if a court determines that Congress has not directly addressed the statutory question at issue:

> the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. The Supreme Court has emphasized that, under Chevron, the question "is not whether [the agency's interpretation] represents the best interpretation of the statute, but whether it represents a reasonable one." *Smiley v. Citibank (South Dakota), N.A.,* —— U.S. ——, ——, 116 S.Ct. 1730, 1735, 135 L.Ed.2d 25 (1996).

The HHS Secretary is the person who "is statutorily responsible for the administration of the Medicare Program, 42 U.S.C. § 1395 *et seq.,* and the administration of federal responsibilities under the Medicaid Act, 42 U.S.C. § 1396–1396n." *Hillhaven West, Inc. v. Bowen,* 669 F.Supp. 312, 313 (S.D.Cal. 1987). The California DHS Director "is responsible for administering California state responsibilities under the Medicaid Act." *Id.* As long as the interpretation of these defendant agencies is reasonable, this court must interpret any ambiguity in the above statutes in their favor.

In *Stephenson v. Shalala,* 87 F.3d 350 (9th Cir.1996), the Ninth Circuit deferred to the HHS Secretary's interpretation of medicare beneficiary co-payments even though "[t]he beneficiaries seem to have offered the better semantic reading." The court justified its deference by referring to the principles of Congressional acquiescence:

> [T]he Secretary contends that whatever the original meaning of "reasonable not to exceed customary," Congress has in any event acquiesced to the Secretary's consistently held view that section 1395cc requires no action on her part to limit outpatient charges under Part B. We believe this is correct.

*Id.* at 355; *see also Wilshire Westwood Associates v. Atlantic Richfield Corp.,* 881 F.2d 801, 808 (9th Cir.1989) (holding that Congress may be deemed to have acquiesced in agency interpretations of which it is aware when it amends the statute in question).

In the instant case, Congress was aware of the HHS Secretary's interpretation of allowing states to cap payments on behalf of QMBs at Medi–Cal payment levels. For example, in 1988 when Congress made medicare cost-sharing mandatory on the states for "pure QMBs," the House Committee Report stated:

> It is the understanding of the Committee that, with respect to dual Medicaid–Medicare eligibles, some States pay the coinsurance even if the amount Medicare pays for the service is higher than the State Medicaid payment rate, while others do not. Under the Committee bill, *States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare—i.e., 80 percent of the reasonable charge—exceeds the amount Medicaid would pay for the same item or service.* However, if a State chooses to pay some or all of the coinsurance in this circumstance, Federal matching funds would, as under current law, be available for this cost.

H.R.Rep. No. 105(II), 100th Cong., 2d Sess. 61 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 884 (emphasis added).

Congress later made similar statements indicating its acquiescence to the position that the Secretary advocates here. In 1989, House Report No. 247 stated:

> The Medicaid programs typically pay the Medicare coinsurance only to the extent that their payment, plus the Medicare payment, *does not exceed what the Medicaid program would pay for the service in question* . . . . The Committee bill . . . does not change the current policy regarding the amount which a Medicaid program must reimburse on such claims.

H.R.Rep. No. 247, 101st Cong., 1st Sess. 364 (1989), *reprinted in* 1989 U.S.C.C.A.N.1906, 2090 (emphasis added).

■ Plaintiffs contend that this legislative history is not relevant to interpretation of these statutes because (1) it accompanied post-enactment amendments, rather than the original enactment; and (2) the House Reports accompanied bills that were substantially modified in the Senate and final versions. The Fourth Circuit, in *Kozlowski,* dismissed the above quotations as "post-enactment" legislative history. The court stated: "It is the intent of the enacting Congress, not that of a subsequent Committee or members of its staff, that controls." 42 F.3d at 1457. This court agrees that post-enact-

ment legislative history is not as direct evidence as the original enactment statements of Congress. However, the Ninth Circuit does rely on post-enactment legislative history to determine whether Congress "acquiesced" in an agency's interpretation of a statute of which Congress was aware when it amended the statute. *Stephenson*, 87 F.3d at 355. The legislative history of the post-enactment amendments quoted above show Congressional awareness of the Secretary's position regarding the issue in this case. Thus, under *Stephenson*, this court finds that Congress "acquiesced" to the caps placed on Medicaid payments in California.

## IV.

The court now turns to the decisions of other courts on the issue presented here. As stated, four Circuit Courts of Appeals have considered the question and have ruled in favor of the plaintiffs' reading of the statute.

In *Kozlowski*, the Fourth Circuit stated that § 1396d(p)(3), which defines Medicare cost-sharing, "seems quite strongly to indicate that the cost-sharing requirement included *all* of the copayments, i.e., the difference between the federal 80% payment and 160% of the reasonable charge." 42 F.3d at 1453. Section 1396a(n), however, says that states "may" pay an amount that, when added to the 80% of reasonable charges payable by Medicare, would exceed the amount payable under a state plan such as Medi–Cal. The *Kozlowski* court offered two explanations for the contradiction between its interpretation and the language of § 1396a(n). First, the court said that one plausible explanation was that "while states under Medicaid are not allowed to pay more than the plan amount, the statute here, to clarify any confusion about whether the state may pay the full 20% included as an item in the Medicare cost sharing definition, tells the state that it may in this instance go ahead and [exceed the state cap]." *Id.* at 1454. But that language is again permissive and not compulsory. Second, the *Kozlowski* court stated that § 1396a(n) more likely meant that "the State

may pay more for QMB payments under Plan B than it pays for dual eligibles under Plan B." *Id.* This statement depends on the amendment history of the Medicare act. When § 1396a(n) was enacted in 1986, there was a difference between "dual eligibles" (those who qualified for both Medicaid and Medicare) and "pure QMBs" (those who were not eligible for Medicare and were low-income, but not so poor as to qualify for Medicaid). *Id.* at 1454–1455. Formerly, states could charge different amounts to dual eligibles and pure QMBs. Thus, according to the *Kozlowski* court, "[i]f a state exercised that option [to require a copayment], it would be paying more for the QMB than for the dual eligible, and this provision appears to be merely stating that is an allowable situation." *Id.* at 1454. However, Congress eliminated this distinction in 1988. Under the present statutes, "dual eligibles" and "pure QMBs" are considered as just QMBs and are treated identically. *Id.* at 1455. Section 1396o provides that dual eligibles and pure QMBs may only be charged "nominal" charges, but Congress left § 1396a(n) unchanged. Given that Congress amended the Medicaid statutes to eliminate the difference between dual eligibles and QMBs without amending § 1396a(n), this court cannot accept *Kozlowski's* position that the permissive language of § 1396a(n) refers only to the pre–1988 option of states to pay higher Medicare benefits to QMBs than to dual eligibles.

In *New York City Health & Hosps. Corp. v. Perales*, 954 F.2d 854 (2d Cir.1992), the Second Circuit also accepted plaintiffs' interpretation.[2] That court explained the apparent contradiction between plaintiffs' argument and § 1396a(n) by stating:

> [I]t appears that the reason that [§ 1396]a(n) authorizes payment beyond the Medicaid amount, when it is required by another section, is to clarify that the Medicaid Act does not prohibit a provider from accepting more than the Medicaid rate.

*Id.* at 861. This would be an odd way for Congress to accomplish such a goal if, as

---

**2.** The Third and Eleventh Circuits essentially adopted the reasoning of the Perales court. *See Pennsylvania Medical Soc. v. Snider*, 29 F.3d 886

(3rd Cir.1994); *Haynes Ambulance Service, Inc. v. Alabama*, 36 F.3d 1074 (11th Cir.1994).

plaintiffs assert, states are *required* to pay 20% of reasonable charges for QMB's through the state Medicaid plans. The *Perales* court's interpretation of § 1396a(n) is not a convincing reason to disregard the reasonable interpretation of the section offered by defendants. Also, the Perales court discounted the relevance of subsequent legislative history. The Ninth Circuit's decision in *Stephenson* places more emphasis on that subsequent legislative history to show Congressional acquiescence.

In *California Ambulance Assoc. v. Shalala,* CV 96–2322 JSL (C.D.Cal. July 23, 1996), and related cases CV 96–3033 and CV 96–5564, another district court held in favor of the plaintiffs. That court adopted the analysis of *Perales,* 954 F.2d 854, *Pennsylvania Medical Society,* 29 F.3d 886, and *Haynes Ambulance Service,* 36 F.3d 1074. However, this court respectfully disagrees and distinguishes those appellate decisions of other circuits in light of *Stephenson* in this circuit.

In the absence of a clear answer in the statutory language, and in light of the United States Supreme Court's decision in *Chevron* and the Ninth Circuit's decision in *Stephenson,* this court must accept defendants' interpretation of the statutes at issue. California may cap its payments at the Medi–Cal maximum levels.

### V.

██ As a separate cause of action, plaintiffs also contend that California must pay 50% of the total amount incurred for outpatient mental health services, rather than 12.5% as asserted by defendants.

Unlike most services, where Medicare pays 80% of the full fee schedule amount, outpatient psychiatric services are only partially covered. Section 1395*l*(c) governs the Medicare payments for outpatient mental health services and provides that:

Notwithstanding any other provision of this part, with respect to expenses incurred in any calendar year in connection with the treatment of mental, psychoneurotic, and personality disorders of an individual who is not an inpatient of a hospital at the time such expenses are incurred, there shall be considered as incurred expenses ... only 62–½ percent of such expenses.

42 U.S.C. § 1395*l*(c) (1996). Accordingly, Medicare coverage for these services is calculated by first excluding 37.5% from the fee schedule amount and then paying 80% of the remaining 62.5%, for a total of 50%. 42 U.S.C. §§ 1395*l*(a, c) (1996).

Defendants argue that, because § 1395*l*(c) limits the incurred expenses to 62.5% of the total expenses, they are only obligated to pay up to 20% of 62.5% as the coinsurance for QMBs, for a total of 12.5%. Plaintiffs contend that Medi–Cal must pay an additional 37.5 % so that it covers the entire remaining 50% not covered by Medicare. Both parties also move for summary judgment on this issue. This is again an issue of interpreting the Medicare and Medicaid statutes. For the reasons discussed below, this court concludes that plaintiffs' interpretation is not supported by the statutes, the legislative history or the regulations.

### A.

██ By virtue of its spending power, Congress may condition receipt of federal funds on certain state actions. *King v. Smith,* 392 U.S. 309, 333, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968). Such conditions, however, must explicitly and unambiguously inform the states of the bargain they make when they agree to accept federal programs. *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1539. "[I]n those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Id.* at 17–18, 101 S.Ct. at 1540.

Congress has not said explicitly, clearly or unambiguously, that states are to pay 50% rather than 12.5% of outpatient mental health services for QMBs. Indeed, the QMB provisions do not mention the exclusion at all. *See* 42 U.S.C. § 1396a(*l*)(10)(E)(i) (1996). Although § 1395cc(a)(2)(A) allows non-QMB patients to be charged personally for the 37.5% excluded amount, nothing in the statute mentions who, if anyone, must pay the excluded amount for QMB patients. *See* 42 U.S.C. § 1395*l*(c) (1996).

**1334**

A state must agree to pay for "medicare cost-sharing" for QMBs in order to receive federal funds for its Medicaid program. 42 U.S.C. § 1396a(a)(10)(E)(i) (1996). The term "medicare cost-sharing" includes four specifically defined categories of costs that fall to a state Medicaid program: premiums, coinsurance, deductibles, and the 20% left unpaid for certain services after Medicare pays 80%. 42 U.S.C. § 1396d(p)(3) (1996). These QMB benefit provisions do not mention Medicare's 37.5% exclusion for outpatient psychiatric services.

### B.

Plaintiffs urge this court to find that the 37.5 % exclusion is implicitly included in the "coinsurance" expenses that states must cover. 42 U.S.C. § 1396d(p)(3)(B) (1996). Although "coinsurance" is not defined in the statute, plaintiffs argue that the legislative history and HHS define the remaining 37.5% of mental health charges as "coinsurance." For example, in its report on 1988 amendments to Medicare, the House Ways and Means Committee stated:

> This bill would increase the limit [in reimbursement for outpatient mental health services] to $1,000 a year.... The *coinsurance* rate on the additional benefits would remain at 50 percent, as under current law....

H.R.Rep. No. 100–105(I), 100th Cong., 2d Sess. 41 (1988) (emphasis added), *reprinted in* 1988 U.S.C.C.A.N. 803, 843. Until 1992, HHS shared this position. Plaintiffs cite a 1989 memo from the then-Acting Director of the Bureau of Eligibility, Reimbursement and Coverage at the U.S. Department of HHS, that supports their position. Buto Memo. (Apr. 7, 1989), Federighi Dec., App. F.[3] However, HHS later changed its position, and it now takes the position that states are required to pay at most 62.5% of 20% of

reasonable charges. Where the Secretary has changed position, her interpretation of the statute is entitled to considerably less deference. *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987).

Although plaintiffs offer support for their interpretation, § 1395*l*(c) does not label the 37.5% in dispute here as "coinsurance." Nor does § 1396d(p)(3)(B) explicitly cross-reference or include the 37.5% in its terms. This court agrees with the Fourth Circuit that "[s]uch a reading of 'coinsurance' violates the boundaries of federal power set forth in *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and finds no basis in the Medicare/Medicaid statutes." *Maryland Psychiatric Soc. Inc. v. Wasserman*, 102 F.3d 717, 719 (4th Cir.1996). "Because no provision in either the Medicare or Medicaid statutes explicitly and unambiguously requires states to cover the 37.5 % exclusion, reading the QMB statute to mandate state coverage imposes a burden in violation of *Pennhurst*." *Wasserman*, 102 F.3d at 720–721. Plaintiffs' interpretation would place a burden on state treasuries beyond that which was apparent when the states agreed to participate in the federal program. "*Pennhurst* does not permit the federal courts to connive in this sort of ambush of state treasuries." *Id.* at 721.

■ This court also agrees with the Fourth Circuit that plaintiffs' member psychiatrists have no statutory right to recover 100% of their reasonable charges in all circumstances. *Wasserman*, 102 F.3d at 721. 42 U.S.C. § 1395cc(a)(2)(A) authorizes providers to charge for the full amount of provided services but it does not guarantee full recovery. Congress has decreed, by excluding a portion of mental health service costs from Medicare reimbursement, that mental

---

**3.** Responding to an inquiry from the Missouri Medicaid Program, Ms. Buto's memo stated:

> The State asks whether its coinsurance responsibility under Medicaid [for mental health services] is 20 percent of 62.5 percent of the approved charges for the services, or that amount plus 37.5 percent of those approved charges.
>
> While the 37.5 percent of approved charges referred to is not usually called a coinsurance

> in Medicare administrative issuances, that is what it, in fact, is. Therefore, the State is responsible for 37.5 percent of the approved charges, plus 20 percent of the remainder of those charges, for outpatient psychiatric services....

(Buto Memo. (Apr. 7, 1989), Federighi Dec., App. F.)

health services have a lesser claim to federal resources than physical health services. Therefore:

It would be ironic to conclude that when Congress designates a particular service for lesser funding it expects states to spend a greater percentage of their limited Medicaid funds on that disfavored service. As the Supreme Court has noted: [Medicaid] was designed as a cooperative program of shared financial responsibility, not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund.

*Id.* at 722 (quoting *Harris v. McRae*, 448 U.S. 297, 309, 100 S.Ct. 2671, 2684, 65 L.Ed.2d 784 (1980)).

This court therefore holds that California has no responsibility to reimburse more than 12.5% of incurred expenses for outpatient mental health services under § 1395*l*(c).

## VI.

For the foregoing reasons this court DENIES plaintiffs' motions for summary judgment and GRANTS defendants' motions for summary judgment.

IT IS SO ORDERED.