CHRISTIAN BRIGGS *vs.* COMMONWEALTH & another.[1]

Suffolk. January 8, 1999. - March 22, 1999.

Present: ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Medicare. Medicaid. Administrative Law,* Agency's interpretation of statute. *Statute,* Construction, Retroactive application.

In circumstances in which the intent of Congress was not clear for the period from 1988 through 1996, with respect to the reimbursement rate for Medicare Part B medical services provided to a class of Medicare beneficiaries known as "qualified Medicare beneficiaries" (QMBs), this court gave substantial deference to the interpretation of the Medicare and Medicaid statutes by the Secretary of the Health Care Financing Administration to the effect that, during that period, States might, at their option, cap reimbursements for Part B services provided to QMBs at the State Medicaid plan rate. [252-254]

Where § 4714 of the Balanced Budget Act of 1997, Pub. L. 105-33, Title IV, § 4714, 111 Stat. 509-510 (1997), did not abrogate any obligation of the Division of Medical Assistance to compensate Medicare Part B medical service providers for their treatment of certain qualified Medicare beneficiaries at rates greater than the State Medicaid plan rate, there was no constitutional impediment to its retroactive application to a health care provider's claims for reimbursements at a higher (Medicare) rate during the years before the effective date of § 4714. [255-257]

CIVIL ACTION commenced in the Superior Court Department on April 28, 1997.

The case was heard by *E. Susan Garsh,* J., on a motion to dismiss.

The Supreme Judicial Court granted an application for direct appellate review.

*Edward F. Haber (Harvey J. Barnett,* of Illinois, *& Christine E. Morin* with him) for the plaintiff.

*Douglas H. Wilkins,* Assistant Attorney General, for the defendants.

MARSHALL, J. Two elderly patients insured by the Federal

[1]Commissioner of the Division of Medical Assistance.

Medicare program received identical medical services from a physician. Medicare did not dispute the physician's charges, and paid him eighty per cent, as provided by Medicare. The physician then billed the first patient for her twenty per cent "copayment." She paid him, as she had agreed to do under the Medicare program. The second patient could not afford to pay her twenty per cent "copayment," so the physician turned to the division of medical assistance, the Massachusetts agency responsible for administering the Medicaid program. The division refused to pay the physician. It said he was entitled to the Medicaid, not the Medicare, rate of reimbursement for his services, and that the eighty per cent he had already received from Medicare was more than the division would pay for treating a Medicaid patient. The physician sued. This illustrative example presents the question to be decided: must the division pay the physician the remaining twenty per cent of his charges.

In more technical terms, this case concerns a dispute between the division and a physician-provider[2] regarding the method of calculating certain deductible and coinsurance reimbursements made by the division on behalf of a class of Medicare beneficiaries known as qualified Medicare beneficiaries (QMBs). On April 28, 1997, the plaintiff filed his class action in the Superior Court. He filed an amended complaint on July 21, 1997. On September 25, 1997, the Commonwealth and the Commissioner (collectively the division) filed a motion to dismiss, claiming that § 4714 of the Balanced Budget Act of 1997 (BBA), Pub. L. 105-33, Title IV, § 4714, 111 Stat. 509-510 (1997), barred the plaintiff's claims. A judge in the Superior Court granted the motion. Judgment entered on March 9, 1998, and the plaintiff took an appeal. We granted the plaintiff's application for direct appellate review. We conclude that the division was authorized to cap reimbursements for medical services provided to QMBs at the applicable Medicaid rate. We affirm the dismissal of the complaint.

I ·

Because this case concerns the interplay between two

---

[2] The plaintiff filed a class action, pursuant to Mass. R. Civ. P. 23 (a), (b), 365 Mass. 767 (1974), on behalf of "[a]ll persons and entities who have furnished services or items covered by Medicare Part B, to Massachusetts [qualified medicare beneficiaries], prior to February 1, 1996." He claims that there are more than 20,000 members of the proposed class. There has been no ruling on class certification.

complex statutory schemes, Medicare and Medicaid, a discussion of the relevant aspects of each will provide the context for the dispute.[3] Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq., first enacted in 1965, provides two types of federally funded medical benefits to certain disabled individuals and people over the age of sixty-five years, regardless of financial need. 42 U.S.C. §§ 426(a), 1395c. Medicare Part A essentially covers hospital, post-hospital, and other inpatient services, and coverage is automatic.[4] 42 U.S.C. §§ 1395c — 1395i-4. Medicare Part B is a supplemental, voluntary insurance program providing coverage for physician and outpatient services. To obtain Part B coverage, patients must pay monthly premiums, and coverage does not begin until patients meet an annual deductible ($100). 42 U.S.C. §§ 1395l(b), 1395r, 1395s. Most important, once the deductible is met, Medicare covers only eighty per cent of the "reasonable charge"[5] for a covered service; the patient is responsible for the remaining twenty per cent, known as the copayment. 42 U.S.C. §§ 1395l(a), 1395w-4. Collectively, the premium, deductibles, and copayment are referred to as "cost-sharing." 42 U.S.C. § 1396d(p)(3).

Medicaid, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., also enacted first in 1965, provides necessary medical assistance for certain low-income individuals, based on financial need.[6] Administered by the States,[7] the program provides Federal financial assistance to States that elect to

---

[3]Addressing a question similar to the one we consider here, the United States Court of Appeals for the Fourth Circuit observed: "[T]he statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase." *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994), cert. denied, 516 U.S. 811 (1995).

[4]Part A of the Medicare program is not at issue in this case.

[5]The "reasonable charge" for each medical service is determined by the Secretary of the United States Department of Health and Human Services (Secretary or HHS).

[6]"The term 'medical assistance' means payment of part or all of the cost of . . . care and services" for eligible individuals "whose income and resources are insufficient to meet all of such cost" of various listed services. 42 U.S.C. § 1396d(a).

provide medical services to low-income individuals. A State that chooses to participate in Medicaid must submit a plan (Medicaid State plan) for approval to the Secretary of the United States Department of Health and Human Services (Secretary or HHS), and must comply with all Federal statutes and regulations. 42 U.S.C. § 1396. Massachusetts has chosen to participate in this public assistance program.

The Federal government reimburses Massachusetts for some, but by no means all, of the costs of participating in Medicaid. See 42 U.S.C. §§ 1396a, 1396b, 1396d(b). States must establish a schedule of reimbursement rates for Medicaid covered services. See 42 U.S.C. § 1396a(a)(13). Because the State Medicaid reimbursement rates generally are lower than the Federal Medicare rates, service providers who participate in the Medicaid program generally receive less than the "reasonable charge" determined by the Secretary for the same service covered under Medicare. See *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski,* 42 F.3d 1444, 1447 (4th Cir. 1994), cert. denied, 516 U.S. 811 (1995). The Medicaid rate frequently is even less than the eighty per cent of the "reasonable charge" paid to providers by the Federal government under Medicare. *Id.*

The Medicare and Medicaid statutes overlap for coverage of the population of elderly or disabled persons (eligible for Medicare) who are also poor (eligible for Medicaid). Referred to as QMBs, they are individuals who qualify for Medicare but who cannot afford to pay for the optional Medicare Part B premiums, deductibles, and copayments.[8] 42 U.S.C. § 1396d(p)(1). QMBs, in turn, fall into two groups: those who are not poor enough to qualify for Medicaid ("pure" QMBs) and those whose level of financial need is so great as to qualify them for Medicaid ("dual eligibles").

Because QMBs are poor and unable to pay for Part B coverage, those for whom the Medicare safety net is most needed are at risk of being excluded from the full range of Medicare protection. From the beginning of Medicare and Medicaid, at least as to dual eligibles, Congress has attempted to address this conundrum. In the intervening thirty-four years, Congress has

---

[7]In contrast, the Federal government does not administer the Medicare program through the States.

[8]The income criteria for QMB eligibility is based on varying percentages, up to and including one hundred per cent, of the Federal "official poverty line." 42 U.S.C. § 1396d(p)(2).

visited and revisited the issue.[9] Of relevance to this lawsuit, QMBs no longer have to pay for Medicare Part B cost sharing. The State bears these costs because, since 1988, Federal law has made a State's participation in the Medicaid program conditional on the State's agreeing to pay on behalf of *all* QMBs the Part B costs that Medicare does not reimburse, 42 U.S.C. §§ 1396a(a)(10)(E)(i), 1396d(p)(3).[10] Medicare (administered by the Federal government) and the division (administering the Medicaid program) employ an automatic crossover billing process by which providers first submit their bills for Medicare Part B services provided to QMBs to Medicare. After Medicare pays its eighty per cent share, the bills automatically are sent to the division for payment of the remaining charges. (Individuals who are not QMBs, of course, pay any additional sums themselves.)

## II

Briggs, a physician who practices in Nantucket, provided medical services to Medicare Part B eligible patients, including QMBs.[11] From 1988 to 1996, he claims, the division impermissibly capped reimbursements of QMB copayments at the lower amounts allowable under the Commonwealth's Medicaid State plan, rather than paying him the (higher) Medicare rates.[12]

[9]See *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994); *Pennsylvania Medical Soc'y* v. *Snider*, 29 F.3d 886, 889 (3d Cir. 1994).

[10]Because payments for QMB cost-sharing are made by State Medicaid plans, States are eligible for Federal reimbursement for a portion of those payments. 42 U.S.C. §§ 1396a(a)(10)(E)(i), 1396b, 1396d(b).

[11]For the purposes of evaluating the granting of a motion to dismiss, " 'we accept as true all of the allegations of the complaint and all reasonable inferences which may be drawn from the complaint and which are favorable to the party whose claims have been dismissed. . . . Further, a motion to dismiss a complaint . . . should not be allowed unless it appears certain that the complaining party is not entitled to relief under any state of facts which could be proved in support of the claim' (citations omitted)." *Harvard Law Sch. Coalition for Civ. Rights* v. *President & Fellows of Harvard College*, 413 Mass. 66, 68 (1992), quoting *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 191 (1982).

[12]The division suggested an example: "suppose plaintiff rendered a service to a QMB for which the Medicare Part B reasonable charge is $100, but the maximum allowable charge under the Commonwealth's Medicaid state plan is $90. Plaintiff would submit a bill to Medicare (which is not administered by the Commonwealth) and receive a payment of $80 (the reasonable charge less

Briggs alleges several theories of liability: breach by the division of its Medicare contract with the Federal government (claiming he was an intended beneficiary); breach of his Medicaid provider agreement (claiming the Federal requirement that the division reimburse full Part B cost-sharing for QMBs was incorporated by reference into his provider agreement); and violation of the Medicaid Act. He also alleges that the division's refusal to reimburse him at the Medicare rate deprived him of his property without due process of law in violation of his Federal constitutional rights. Briggs sought damages for the full amount of unreimbursed Medicare cost-sharing for Medicare Part B services provided to QMBs from 1988 to January 31, 1996.

In 1988, Congress amended the Medicaid Act to require participating States to enroll all QMBs in Medicare Part B by paying the insurance premiums, deductibles, and twenty per cent copayments with Medicaid funds, or risk losing Federal matching funds.[13] Medicare Catastrophic Coverage Act of 1988, Pub. L. 100-360, Title III, § 301(a)(1), 102 Stat. 683, 748,

---

the 20% copayment). At present (and prior to February 1, 1996), the Division would pay the plaintiffs an additional $10 (the difference between Medicare's payment and the maximum allowable charge under Medicaid)."

[13]The 1988 legislation was the culmination of numerous attempts by Congress to ensure the availability of Medicare Part B coverage for impoverished persons. At the inception of Medicaid in 1965, States were required to pay the full deductibles for Part A. With respect to Part B, states could pay none (according to HCFA), some, or all (according to the providers) of Part B cost-sharing of eligible individuals over the age of 65. Social Security Amendments of 1965, Pub. L. 89-97, Title I, Part 2, § 121(a), 70 Stat. 286, 1965 U.S.C.C.A.N. 305, 370-373 (codified prior to repeal at 42 U.S.C. § 1396a[a][15]). See *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski*, *supra* at 1451. Beginning in 1967, Congress effectively made the program for "dual eligibles" mandatory by denying Federal matching Medicaid funds to States for costs that could have been avoided if the individual had been enrolled in Medicare Part B coverage. Social Security Amendments of 1967, Pub. L. 90-248, Title II, Part 2, § 222(c), 81 Stat. 821, 901, codified, as amended, 42 U.S.C. § 1396b(b)(1). To obtain the Federal matching funds, States were required to pay both the premium and, of greater significance, the Part B cost-sharing for "dual eligibles." In 1986, Congress extended the program to permit, but not require, States to pay the Part B cost-sharing for "pure" QMBs. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, Title IX, Subtitle E, Part 1, § 9403, 100 Stat. 1874, 2053-2054. Finally, in 1988, Congress extended *mandatory* coverage of Part B cost-sharing to "pure" QMBs. Medicare Catastrophic Coverage Act of 1988, Pub. L. 100-360, Title III, § 301(a)(1), 102 Stat. 683, 748, codified at 42 U.S.C. § 1396a(a)(10)(E)(i). Later in 1988, Congress redefined the term "qualified medicare beneficiary"

codified at 42 U.S.C. § 1396a(a)(10)(E)(i). Specifically, § 1396a(a)(10)(E)(i) provides that "[a] State plan for medical assistance *must . . .* provide . . . for making medical assistance available for medicare cost-sharing (as defined in section 1396d[p][3] of this title)[14] for [QMBs]" (emphasis added). Two years previously, in 1986, Congress had amended the Medicaid Act to provide:

> "In the case of medical assistance furnished under this subchapter for medicare cost-sharing respecting the furnishing of a service or item to a [QMB], the State plan *may* provide payment in an amount with respect to the service or item that results in the sum of such payment amount . . . *exceeding the amount that is otherwise payable under the State plan* for the item or service for eligible individuals who are not [QMBs]" (emphasis added).

42 U.S.C. § 1396a(n). The division took the position (as did the Secretary)[15] that § 1396a(n) authorized it to reimburse QMB providers at the Commonwealth's Medicaid plan rate, not the Medicare rate. See 130 Code Mass. Regs. § 450.317(A) and § 450.318 (1989), the relevant portions of which are set out in the margin.[16] There matters stood until 1996 when, apparently in response to decisions of four Courts of Appeals (discussed later), the division changed its position regarding Part B

---

to include both "dual eligibles" and "pure" QMBs. Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, Title VIII, Part 4, § 8434(a), 102 Stat. 3342, 3805, codified at 42 U.S.C. § 1396d(p)(1).

[14]Title 42 U.S.C. § 1396d(p)(3) defines "medicare cost-sharing" and identifies the allowable costs incurred with respect to a QMB, without regard to whether the costs incurred were for items and services for which medical assistance is otherwise available under the State Medicaid plan.

[15]Following the 1967 legislation effectively making Part B coverage for "dual eligibles" mandatory, the Secretary took the position that States could "cap" reimbursement at the State plan Medicaid rate, and were not required to pay the full Medicare cost-sharing rates for any QMB. See, e.g., Department of Health & Human Services Memorandum (FTP-3) (Sept. 28, 1981).

[16]"*450.317: Third-Party Liability: Limitation on Claims for Recipients with Health Insurance*

> "(A) . . . The [Division] will pay only the amount, if any, by which the maximum allowable amount payable by the [Division] under the applicable rate or fee schedule exceeds the total amount payable by the health insurer or insurers. . . .

> "450.318: Third-Party Liability: Special Rules for Medicare

reimbursement for QMBs and promulgated a "new policy" permitting a provider to be reimbursed by the division at the full Medicare "reasonable charge."[17]

In the wake of that policy change Briggs filed this action. Relying primarily on the mandatory ("must") language of § 1396a(a)(10)(E)(i) of the Medicaid Act, he sought reimbursement for the full amount of the Medicare "reasonable charge" for all medical services delivered to QMBs between 1988 and 1996. Before his claims could be adjudicated, Congress revisited the area and, in August, 1997, enacted the BBA that "clarified" that a State is *not* required to reimburse QMB providers at the Medicare rate, but may utilize the lower Medicaid rate. 42 U.S.C. § 1396a(n)(2), inserted by Pub. L. 105-33, § 4714, 111 Stat. 509-510.[18] The 1997 amendment is applicable to all payments for services provided after the date of enactment, as well as to payments for services rendered before the date of enactment "if such payment is the subject of a lawsuit that is based

". . . In order to secure payment by the [Division] of any coinsurance and deductible amounts to equal a total payment to the provider not in excess of the [Division]'s maximum allowable amount, the provider must follow the [Division]'s billing instructions . . . ."

[17]The new policy was described in All Provider Bulletin 94 (Feb. 1996), entitled Reimbursement for the Medicare Part B Coinsurance and Deductible:

"Effective for dates of service on or after February 1, 1996, the Division's reimbursement policy has changed both for recipients who have Medicare coverage in addition to Medical Assistance and for qualified Medicare beneficiaries who have Medicare only. Medicare Part B crossover claims will be reimbursed with full coinsurance and deductible payment."

[18]Section 4714(a) of the BBA, entitled "Clarification Regarding State Liability for Medicare Cost Sharing," amended § 1396a(n) of the Medicaid Act by adding the following paragraph:

"(2) In carrying out paragraph (1), a State is *not* required to provide any payment for any expenses incurred relating to payment for deductibles, coinsurance, or copayments for medicare cost-sharing to the extent that payment under . . . [Medicare] for the service would exceed the payment amount that otherwise would be made under the State plan under this title for such service if provided to an eligible recipient other than a medicare beneficiary."

on [the sections of the Medicare and Medicaid Acts that define 'Medicare cost-sharing']" and was "pending as of, or is initiated after, the date of the enactment" of the BBA. Pub. L. 105-33, § 4714(c), 111 Stat. 509-510. See *McCreary* v. *Offner*, 1 F. Supp. 2d 32, 35 (D.D.C. 1998).

Briggs filed his amended complaint in July, 1997, and as such his lawsuit was "pending as of . . . the date of the enactment" of § 4714. His claims are, accordingly, subject to the 1997 amendment. He contends that, prior to 1997, the law governing Part B reimbursements for QMBs *required* the division to reimburse providers at the Medicare rate. Far from being a "clarification," he continues, § 4714 is a substantial amendment to this settled law, and its retroactive application gives rise to serious constitutional problems. The division counters that, before 1997, the relevant statutory provisions did not reflect Congress's clear intention regarding QMB reimbursement, and § 4714 is, as it was labeled by Congress, only a "clarification" of the law.[19]

## III

We consider first Briggs's argument that before 1997, the Medicaid Act unambiguously required the division to reimburse him at the Medicare "reasonable charge" rate for all medical services he provided to QMBs. Briggs relies primarily on the decisions of four United States Courts of Appeals to that effect. See *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski*, 42 F.3d 1444 (4th Cir. 1994); *Haynes Ambulance Serv. Inc.* v. *State*, 36 F.3d 1074 (11th Cir. 1994); *Pennsylvania Medical Soc'y* v. *Snider*, 29 F.3d 898 (3d Cir. 1994); *New York City Health & Hosps. Corp.* v. *Perales*, 954 F.2d 854 (2d Cir. 1992). The focus in each case was an interpretation of the 1986 provision of the Medicaid Act, § 1396a(n), that the State Medicaid plan '*may*' provide payment to providers for services to QMBs in an amount exceeding the Medicaid rate. In each case, the Secretary

---

[19]The division also claims that Briggs's contractual and constitutional claims should be dismissed because he has not exhausted the administrative remedies available to him to appeal the denial of his claims to the division's claims review board. Resolution of Briggs's claims concern, at a minimum, the construction of several Federal statutes. The "duty of statutory interpretation is for the courts," not for an administrative agency. *Casey* v. *Massachusetts Elec. Co.*, 392 Mass. 876, 879 (1984), quoting *Cleary* v. *Cardullo's Inc.*, 347 Mass. 337, 334 (1964).

argued that "may" should be read as permissive, and took the position that States had the option to pay or to deny payment for claims in excess of the maximum allowed in each State Medicaid plan.[20] Providers invoked a different section of the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(E)(i), providing that States participating in Medicaid "must" provide for "making medical assistance available for medicare cost-sharing."[21] The four Courts of Appeals were asked to reconcile what appeared to be the permissive ("may") language of § 1396a(n) with the mandatory ("must") language of § 1396a(a)(10)(E)(i).

Each court concluded that the disputed provisions unambiguously precluded the States from capping QMB copayment reimbursements at the lower State Medicaid plan rates. But the opinions make abundantly clear that the statutory provisions in question are susceptible to differing, and arguably plausible, interpretations. The United States Court of Appeals for the Second Circuit, the first to consider the question, reasoned that the "may" language of § 1396a(n) "clarif[ied]" that "the Medicaid Act does not prohibit *a provider* from *accepting* more than the Medicaid rate" (emphasis added). *New York City Health & Hosps. Corp.* v. *Perales, supra* at 859. In contrast, the United States Court of Appeals for the Third Circuit, the next to consider the issue, concluded that § 1396a(n) "authorizes *the states to deviate*" from their State plans with respect to QMB Part B cost-sharing payments, "thus carving out an exception to the general requirement to comply with the Medicaid fee schedules or payment methods" (emphasis added). *Pennsylvania Medical Soc'y* v. *Snider, supra* at 895. The *Snider* court expressly rejected the Secretary's interpretation of § 1396a(n), and ruled that the provision did not create an option for States to reimburse at either the Medicare or Medicaid rate. "Unable to improve upon [that] analysis . . . " the United States Court of Appeals for the Eleventh Circuit adopted the same reasoning. *Haynes Ambulance Serv., Inc.* v. *State, supra* at 1076. Finally, in *Kozlowski* the court concluded that § 1396a(n) permitted States to pay more for a "pure" QMB than for a "dual eligible"

[20]The division interpreted § 1396a(n) in the same way and, as described above (see note 16, *supra,* and accompanying text), denied payment for claims in excess of the maximum allowed in the Commonwealth's Medicaid plan, and promulgated a regulation to that effect.

[21]The requirement that a State must share the costs with Medicare or risk forfeiture of Federal reimbursement does not, of course, establish how much of the cost of Medicare the State must share.

person. *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski, supra* at 1454. In short, while four appellate courts agreed that States were prohibited from imposing State Medicaid plan limitations on QMB cost-sharing payments, they did so interpreting the 1986 and 1988 amendments to the Medicaid Act in very different ways.[22]

If confusion concerning the meaning of § 1396a(n) was not already apparent, there were dissenting views expressed in *Perales* and *Kozlowski*, as well as by several Federal District Court judges who later considered the same issue. See, e.g., *New York City Health & Hosps. Corp.* v. *Perales, supra* at 863 (Cardamone, J., dissenting); *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski, supra* at 1462 (Niemeyer, J., concurring in part and dissenting in part); *Dameron Physicians Medical Group, Inc.* v. *Shalala*, 961 F. Supp. 1326 (N.D. Cal. 1997); *Kulkarni vs.* Leean, U.S. Dist. Ct. No. 96-C-884-S (W.D. Wis. 1997). Those judges agreed with the Secretary that the statutory scheme was indeed ambiguous, and did not clearly express what Congress had intended concerning the rate of QMB cost-sharing reimbursement. Circuit Judge Cardamone concluded that, because "[t]he majority's interpretation of these Acts simply does not lay out a 'clear' *plan of Congress* contrary to the Secretary's construction of the same statutes," deference to the Secretary's reasonable interpretation was warranted (emphasis in original). *New York City Health & Hosps. Corp.* v. *Perales, supra* at 864, 867 (Cardamone, J., dissenting). Circuit Judge Niemeyer, writing separately in the *Kozlowski* case, concluded that Congress had not spoken directly to the issue of the reimbursement rate for providers of medical services to QMBs, and that deference to the Secretary's interpretation was appropriate, noting that "the fact that well-intentioned and intelligent experts at legal exegesis have arrived at three or four seemingly plausible readings of a particular text may be the best evidence that this interpretive puzzle has no definitive answer."[23] *Rehabilitation*

---

[22]The United States Court of Appeals for the Ninth Circuit later noted: "Section 1396a(n) [enacted in 1986] is a superb example of the baffling nature of the statute. It has shown itself to be particularly resistant to a single simple interpretation, and hence particularly in need of clarification." *Beverly Community Hosp. Ass'n* v. *Belshe*, 132 F.3d 1259, 1266 (9th Cir. 1997), cert. denied, 119 S. Ct. 334 (1998).

[23]See *Dameron Physicians Medical Group, Inc.* v. *Shalala*, 961 F. Supp. 1326, 1330 (N.D. Cal. 1997) (court could not "conclude that the statutory

*Ass'n of Va., Inc.* v. *Kozlowski, supra* at 1462-1463 (Niemeyer, J., concurring in part and dissenting in part).

We need not conclude for ourselves which of the many plausible interpretations of § 1396a(n) represents the most probable intent of Congress. Our own review of the statutory provisions at issue, their accompanying legislative histories, and the numerous judicial interpretations of the statute before and after the 1997 "clarification" of the BBA, confirms for us that prior to 1997, Congress was not clear in its intentions regarding the reimbursement rate for providers of Part B medical services to QMBs prior to the 1997 enactment of the BBA. We are not alone in reaching that view. See, e.g., *Paramount Health Sys., Inc.* v. *Wright,* 138 F.3d 706 (7th Cir.), cert. denied, 119 S. Ct. 335 (1998); *Beverly Community Hosp. Ass'n* v. *Belshe,* 132 F.3d 1259 (9th Cir. 1997), cert. denied, 119 S. Ct. 334 (1998). *Dameron Physicians Medical Group, Inc.* v. *Shalala, supra;* Kulkarni *vs.* Leean, *supra.* We agree with the United States Court of Appeals for the Seventh Circuit that "[t]he Act is a hopeless muddle so far as [QMB] reimbursement is concerned," *Paramount Health Sys., Inc.* v. *Wright, supra* at 711. We certainly have little difficulty in rejecting Briggs's claim that between 1988 and 1996 Federal law unambiguously mandated the division to reimburse providers for Medicare Part B services provided to QMBs at the Medicare rate.[24]

Because we conclude that, before 1997, Congress had not

language is so clear that further aids to statutory interpretation are unnecessary"). See also Kulkarni *vs.* Leean, U.S. Dist. Ct. No. 96-C-884-S (W.D. Wis. 1997), noting:

> "The majority and dissenting opinions in these circuit court decisions have extensively considered both text of the Medicare and Medicaid Acts as well as the legislative history. Although there is no reason to repeat the arguments in depth, careful consideration of these decisions leads to only one conclusion: the provision of the Medicare and Medicaid Acts in question are susceptible to several conflicting reasonable interpretations. That is, they are ambiguous."

[24]Briggs alleges that the division capped its reimbursement for Medicare Part B services provided to QMBs beginning in 1988. The Commonwealth does not counter this allegation, but the division's regulations suggest otherwise. In June, 1984, the division first promulgated regulations to limit provider reimbursements to the Medicaid rate for recipients who were also covered by Medicare. Medical Assistance Program Transmittal Letter ALL-9, June, 1984, effective July 1, 1984. This letter states, however, that "enforce-

"directly spoken to the precise question at issue," *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), and in light of the many interpretations of the applicable provisions that have been suggested since judges first grappled with the issue, deference to the interpretation of the Health Care Financing Administration (HCFA), the agency charged with the interpretation and enforcement of the Medicare and Medicaid statutes, is warranted. *Id.* at 845. See *Gateley's Case*, 415 Mass. 397, 399 (1993); *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595 (1992) (interpretation of agency charged with primary responsibility for administering statute entitled to substantial deference). At least as early as 1971, when it took the position that State contribution toward Part B cost-sharing was entirely optional, and consistently over the ensuing years, HCFA has maintained that States have the option of capping reimbursements for Medicare Part B services provided to QMBs at the lower State Medicaid plan rate. See notes 13 and 15, *supra.* The division followed the Secretary's lead, and took the same position. See notes 16 and 24, *supra.*[25]

ment through the claims-processing system will initially be applied *only to Medicare Part A* claims submitted by acute inpatient hospital providers. . . . [P]ayment of Medicare Part A and Part B coinsurance and/or deductibles for claims submitted by other providers will remain unchanged pending the development of necessary claims-processing capabilities. Providers will receive notice of the [division]'s intent to expand enforcement of these regulations." The "expansion of enforcement" to include Medicare Part B coinsurance did not occur until January 1, 1991. In Physician Bulletin 41, dated December, 1990, the division stated:

"Effective January 1, 1991, the [division] will allow payment of Medicare Part B coinsurance and deductible only when the following conditions are met: the service for which reimbursement is requested is a Medicaid-covered service, and the combined Medicare and Medicaid payment will not exceed the Medicaid maximum allowable amount; or the patient is a [QMB] . . . and the combined Medicare and Medicaid payment will not exceed the maximum amount allowable by Medicaid.

"All providers were informed of this change in June 1984 by Transmittal Letter ALL-9. However, at that time, the change applied only to Medicare Part A claims submitted by acute inpatient hospitals. *As was originally intended, this change will now apply to all Medicare claims processed on or after January 1, 1991*, regardless of the date of service." (Emphasis added.)

Because we determine that the division was authorized to cap its reimbursements for Part B services provided to QMBs at the Commonwealth's Medicaid plan rate, it is not necessary for us to clarify this confusion.

[25]The division changed its policy to provide for reimbursement at the full

Deference to the Secretary's interpretation is particularly appropriate where, as here, congressional reports reveal that Congress was aware of HCFA's interpretation that States could cap cost-sharing payments at the lower Medicaid rates, and expanded QMB coverage on that basis. See note 13, *supra,* and accompanying text. In 1988 Congress took the critical step of making coverage for "pure" QMBs mandatory. That had the potential of imposing significant financial burdens on the States, albeit for costs that could, in part, be recouped from the Federal coffers through Medicaid matching fund provisions. See note 10, *supra.* In connection with that 1988 amendment, § 1396a(a)(10)(E)(i), the House Committee Report stated:

> "The bill would require States to pay Medicare cost-sharing, including coinsurance, on behalf of eligible individuals. It is the understanding of the Committee that, with respect to dual Medicaid-Medicare eligibles, some States pay the coinsurance even if the amount that Medicare pays for the service is higher than the State Medicaid payment rate, while others do not. *Under the Committee bill, States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare — i.e., 80 percent of the reasonable charge — exceeds the amount Medicaid would pay for the same item or service.* However, if a State chooses to pay some or all of the coinsurance in this circumstance, Federal matching funds would, as under current law, be available for this cost." (Emphasis added.)

H.R. Rep. No. 105(II), 100th Cong., 2d Sess., 61, reprinted in 1988 U.S.C.C.A.N. 857, 884.[26]

---

Medicare rate in 1996, we assume in response to the four appellate court decisions discussed above mandating payment at the full Medicare rate.

[26]The United States Court of Appeals for the Fourth Circuit gave no weight to the 1988 legislative history, concluding that it was subsequent history entitled to no consideration, and noting that the legislation created "minor amendments to the statute." *Rehabilitation Ass'n of Va., Inc.* v. *Kozlowski,* 42 F.3d 1444, 1455-1457 (4th Cir. 1994). We are not so dismissive of this earlier legislative history. Although the 1988 amendment to the QMB legislation effected a small textual change to § 1396a(a)(10)(E) by striking out the words "at the option of a State," it placed a new, substantive burden on the States by requiring them to provide Part B coverage for "pure" QMBs, individuals who

## IV

Finally, we consider Briggs's constitutional challenge to the retroactive application of § 4714 of the BBA, "clarifying" (as Congress captioned the legislation) that States are not required to reimburse providers for medical services to QMBs at Medicare rates. As a clarification of the law, § 4714 may be applied retroactively without constitutional concern. If, on the other hand, § 4714 amends the prior law, any retroactive application opens a Pandora's box of constitutional issues.

Resolution of the question turns, in part, on the weight we accord to the expression of earlier congressional intent in later-enacted legislation. In *Loving* v. *United States*, 517 U.S. 748, 770 (1996), the Supreme Court observed that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Id.*, quoting *Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). It was essentially on that basis that the United States Court of Appeals for the Ninth and Seventh Circuits concluded that the 1997 legislation could be applied retroactively to providers such as Briggs. See *Paramount Health Sys., Inc.*, *supra* at 711; *Beverly Community Hosp. Ass'n* v. *Belshe, supra* at 1265-1266.[27] We need not enter the debate concerning the circumstances in which it is appropriate for a court to give weight to expressions in congressional legislation of the intent of an earlier enacted congressional statute, see 2B Singer, Sutherland Statutory Construction § 49.11, at 83-84 (5th ed. 1992),

---

were not even eligible for Medicaid coverage. Medicare Catastrophic Coverage Act of 1988, Pub. L. 100-360, § 301(a)(1), 102 Stat. 683, 748.

[27]The *Paramount* court has questioned continued reliance on the continuing vitality of *Loving* v. *United States*, 517 U.S. 748 (1996), in light of *South Dakota* v. *Yankton Sioux Tribe*, 522 U.S. 329 (1998), and *Rainwater* v. *United States*, 356 U.S. 590 (1958), noting that despite *Loving*'s mandate that subsequent legislation be afforded "great weight," the Court in *Yankton* and *Rainwater* had actually given subsequent legislation very little weight. *Paramount Health Sys., Inc.* v. *Wright, supra* at 711. The court nevertheless concluded that it was "constrained by *Loving* to give *some* weight to Congress's declaration in the [BBA] that providers of services to [QMBs] are not entitled to reimbursement at full Medicare rates" (emphasis in original). *Id.* In contrast, the United States Court of Appeals for the Ninth Circuit stated that, it "has been established law since nearly the beginning of the republic . . . that congressional legislation that thus expresses the intent of an earlier statute must be accorded great weight (see most recently *Loving* v. *United States*, [*supra*])," and gave full effect to the 1997 "clarification." *Beverly Community Hosp. Ass'n* v. *Belshe, supra* at 1265.

because we have no doubt that the 1997 legislation did not retroactively abrogate any obligation of the division to compensate Briggs at the full Medicare cost-sharing rates for Part B services.

Section 4714 is consistent with Congress's over-all legislative reimbursement scheme — long in place — that differentiates between Federal Medicare reimbursement for medical services to the elderly and disabled on the one hand, and State Medicaid payments for medical services to the financially needy on the other. Medicaid is an insurer of last resort. In mandating that States pay for Medicare Part B cost-sharing for all QMBs, some of whom do not even qualify for Medicaid, the Secretary was surely not unreasonable in interpreting the law to allow States to limit the costs they were now required to incur where the statutes did not precisely express otherwise. In our view, HCFA interpreted the statutes in a way that is, and presumably was thought by Congress to be, consistent with the statutory scheme. See notes 13 and 15, *supra.* Nevertheless, the decisions of not one, but four Courts of Appeals threw a "wrench in the works," interpreting the statutes to require reimbursement at the higher Medicare rate. Congress then "clarified" the law. In these circumstances it is appropriate for us to respect the congressional expression concerning the earlier enacted statutory amendments. See *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.,* 444 U.S. 572, 596 (1980) (when precise intent of enacting Congress is obscure, view of subsequent Congress entitled to significant weight). To do otherwise is to suggest that Congress must remain mute while courts do battle with an agency to which Congress has delegated interpretative action, even where Congress has acquiesced in the agency's interpretation.

The 1997 Conference Report made clear that this is what motivated Congress to act in 1997. It expressed its view that, under then current law, States were permitted to limit reimbursement of cost-sharing charges to the Medicaid rate and acknowledged that this had long been the States' practice:

> "The amount of required payment has been the subject of some controversy. State Medicaid programs frequently have lower payment rates for services than the rates that would be paid under Medicare. Program guidelines permit states to pay either (1) the full Medicare deductible and coinsurance amounts or (2) cost-sharing charges only to

the extent that the Medicare provider has not received the full Medicaid rate for an item or service."

H.R. Rep. 217, 105th Cong., 1st Sess., at 870, reprinted in 1997 U.S.C.C.A.N. 491. It acknowledged that "[s]ome courts have forced state Medicaid programs to reimburse Medicare providers to the full Medicare allowable rates for services provided to QMBs and dually eligible individuals," and went on to explain that the 1997 amendment:

> "*[c]larifies* that state Medicaid programs may limit Medicare cost-sharing to amounts that, with the medicare payment, do not exceed what the state's Medicaid program would have paid for such service to a recipient who is not a QMB. [It] [s]pecifies that the Medicare payment plus the state's Medicaid payment will be considered payment in full and the QMB will not be liable for payment to a provider or managed care entity. . . " (emphasis added).

*Id.* at 870-871, reprinted in 1997 U.S.C.C.A.N. 491-492. Because the 1997 "clarification" was just that, and did not amend settled law, we see no constitutional impediment to the retroactive application of § 4714 to Briggs's pending claims. See *Paramount Health Sys., Inc.* v. *Wright, supra* at 711; *Beverly Community Hosp. Ass'n* v. *Belshe, supra* at 1265-1266; *McCreary* v. *Offner*, 1 F. Supp. 2d 32, 37 (D.D.C. 1998).

## V

The division's policies and regulations, capping reimbursements for Part B services provided to QMBs at the Commonwealth's Medicaid State plan rates between 1988 and January 31, 1996, were consistent with the Medicare and Medicaid Acts. The division's refusal to reimburse Briggs more than the applicable rates of the Commonwealth's Medicaid plan did not constitute a breach of either the division's Medicare contract with the Federal government, or its Medicaid contract with Briggs. Section 4714 may be applied retroactively without depriving Briggs of any constitutional or contractual rights.

*Judgment affirmed.*