WILLIAM B. DIGREGORIO vs. REGISTRAR OF MOTOR
VEHICLES & another.[1]

No. 10-P-292.

Hampden. November 4, 2010. - February 17, 2011.

Present: DUFFLY, KANTROWITZ, & MILKEY, JJ.[2]

*Registrar of Motor Vehicles,* Revocation of license to operate. *Board of Appeal on Motor Vehicle Liability Policies and Bonds. Motor Vehicle,* Operating under the influence, Board of Appeal on Motor Vehicle Liability Policies and Bonds, License to operate.

This court concluded that G. L. c. 90, § 24(1)(*c*)(3), prohibits the Registrar of Motor Vehicles (registrar) from restoring the driving privileges of an individual who has been convicted for a third time of operating a motor vehicle while under the influence of intoxicating liquor until eight years after the date of the third conviction, rather than the date the registrar learns of that conviction. [779-783] KANTROWITZ, J., dissenting.

In a civil action challenging a decision of the board of appeal on motor vehicle liability policies and bonds (board), the plaintiff, who had been convicted three times of operating a motor vehicle while under the influence of intoxicating liquor, failed to demonstrate that the board erred in declining to issue him a hardship license, where there was a question whether the plaintiff actually requested a hardship license from the Registrar of Motor Vehicles, and where, in any event, the plaintiff had not pointed to any evidence in the record documenting the extent of the burdens he faced in having to hire a driver to get to work. [783-784]

CIVIL ACTION commenced in the Superior Court Department on June 6, 2008.

The case was heard by *Peter A. Velis,* J.

*Edward J. Partyka* for the plaintiff.

*Kerry David Strayer,* Assistant Attorney General, for the defendants.

___

[1]Board of Appeal on Motor Vehicle Liability Policies and Bonds.

[2]Justice Duffly participated in the deliberation on this case while an Associate Justice of this court, prior to her appointment as an Associate Justice of the Supreme Judicial Court.

MILKEY, J. Because the plaintiff, William B. DiGregorio, had been convicted, for a third time, of driving a motor vehicle while under the influence of intoxicating liquor (OUI), the Registrar of Motor Vehicles (registrar) was prohibited by statute from restoring his driving privileges until a designated date. See G. L. c. 90, § 24(1)(*b*), (1)(*c*)(3). The main issue on appeal has to do with how long this automatic statutory prohibition lasts. The plaintiff argues that he can seek restoration of his driving privileges upon the eight-year anniversary of his third conviction. The defendants maintain that the operative date is eight years after the registrar learned of that conviction. DiGregorio also appeals from the denial of his request for a hardship license. We reverse the judgment insofar as it affirms the date that the defendants set as to when DiGregorio can seek restoration of his license.

*Background.* The plaintiff is a chiropractor who lives in Wales, a Massachusetts town that lies near the Connecticut border. He has a long history of driving infractions in both States. In 1997, he was convicted in Massachusetts of OUI, his first such conviction. He was then convicted of OUI in Connecticut on April 18, 2000. For this conviction, Connecticut suspended his driving privileges in that State, and on May 24, 2000, Connecticut placed a notice of that suspension in the National Driver Register (NDR), an interstate repository for the sharing of driving records.[3] The Massachusetts registrar did not learn of the out-of-State conviction or suspension at that time.

On November 29, 2002, the registrar suspended DiGregorio's license because he had been convicted of illegal possession of a Class D substance earlier that year. Upon DiGregorio's application, the registrar restored his license on January 16, 2004. However, in the process of reviewing the request, the registrar checked DiGregorio's driving history in the NDR system and learned of his 2000 OUI-related suspension in Connecticut. As

---

[3]The May 24, 2000, date appears to be the date that Connecticut entered the suspension in the NDR system (a step that the board of appeal on motor vehicle liability policies and bonds, which heard the appeal of the suspension at issue here, characterized as "plac[ing] a hold on [DiGregorio's] license via the NDR system because of the 2000 alcohol offense"). It is not clear whether the Connecticut suspension began on May 24, 2000, or on an earlier date. In a footnote in their brief, the defendants suggest that the May 24, 2000, suspension was unrelated to the 2000 OUI incident. This assertion appears to be inconsistent with the board's findings and the administrative record.

a result, the same day that the registrar restored DiGregorio's driving privileges, the registrar sent him a notice informing him that his Massachusetts license would be suspended indefinitely effective February 15, 2004. DiGregorio has not had permission to drive in Massachusetts since that date.

Nevertheless, it is apparent that DiGregorio continued to drive at least for a time, because he was again arrested in Connecticut for OUI in June of 2004.[4] He was convicted of that offense on October 4, 2004 (his second OUI conviction in Connecticut and his third overall). The record indicates that Connecticut issued two new suspension notices related to the June, 2004, incident and that Connecticut entered a record of these suspensions (but not of the October, 2004, conviction itself) into the NDR database on July 6, 2004, and November 24, 2004. However, the registrar apparently had no occasion to check the NDR database at this time and instead first learned of the 2004 Connecticut incident from her review of NDR records in April of 2007.[5]

In January of 2005, Connecticut informed DiGregorio that he could not get his driving privileges there restored until he completed a certified alcohol treatment program. He successfully completed such a program in 2007,[6] and Connecticut on November 20, 2007, removed its suspension, effective December

---

[4]The board found that DiGregorio "was driving in Massachusetts *throughout* the time his license was suspended in Connecticut" (emphasis supplied). The evidentiary basis for this finding is not clear. This fact is not established by the documentary materials in the administrative record, and notwithstanding a reference in the board's decision that it "heard testimony" from a registrar witness, the parties have stipulated that the hearing before the hearing officer "only contained argument and not evidence." Further, as the defendants acknowledge, DiGregorio was prevented from producing a transcript of the hearing, because the recording that the board made was inaudible.

[5]Even though the February 15, 2004, license suspension remained in effect, the registrar sent DiGregorio a new license suspension notice on April 25, 2007. This notice makes reference to the NDR entries from July 6, 2004, and November 24, 2004.

[6]Pursuant to a waiver approved by Connecticut, the treatment took place in Massachusetts at Wing Memorial Hospital in Palmer. The program, which was State-certified, included a diagnostic evaluation and thirty-six group therapy sessions. At DiGregorio's completion of the program, the program coordinator certified that "Mr. DiGregorio demonstrated sound progress and was in compliance with our treatment plan goals. His motivation, participation, and attitude were all above satisfaction throughout the duration of the treatment." On this basis, she recommended that his driving privileges be restored.

3, 2007. At this time, Connecticut officially entered a record of his 2000 and 2004 OUI convictions into the NDR database.

Although Connecticut had lifted its suspension, the registrar's February, 2004, revocation of DiGregorio's Massachusetts license remained in effect. He applied to have his license restored, and this prompted the registrar to check the NDR records. There, in April, 2007, the registrar found the references to the 2000 and 2004 Connecticut convictions (as noted *infra*, the registrar learned of the suspensions that were based on the incidents underlying the convictions in 2004 and 2007, respectively). On December 26, 2007, the registrar sent DiGregorio a notice that, effective January 5, 2008, his license (which, at the time, was already under an indefinite suspension) was being revoked for an additional eight years because he had been convicted of a third OUI charge.

DiGregorio filed a timely appeal with the board of appeal on motor vehicle liability policies and bonds (board). He also requested — by way of alternative relief — that the board give him a hardship license. After the board held a hearing on May 6, 2008, it issued an order upholding the registrar's revocation of his license until January 5, 2016. In an accompanying "[s]tatement of [r]eason for [d]ecision," the board explained its view that it was statutorily "mandated to take action and suspend the appellant's license for eight years" and that the registrar could do so only upon receiving official notice of the third OUI conviction. Although the board did not expressly rule on DiGregorio's request for a hardship license, it declined to offer him that relief. The board also specifically concluded that his having to hire a paid driver, which he had already been doing at the time of his hearing, "to get to and from his obligations" amounted to only an "inconvenience[]," not a "hardship."[7]

On DiGregorio's judicial appeal filed pursuant to G. L. c. 30A,

---

[7] In its decision, the board noted its concern that DiGregorio "remains a threat to public safety," and it made subsidiary findings to that effect. Specifically, the board found that DiGregorio "has failed to address his alcohol problem," that "[h]e reports that he is still drinking despite three OUI arrests," that he "does not have any support system in place," and that he "appears to be in denial about his addiction." The evidentiary basis for these findings is not at all clear, because the documentary evidence was to the effect that DiGregorio had addressed his alcohol problems through two years of

a Superior Court judge upheld the board's decision. He concluded that "the Registry properly applied a January 5, 2008 revocation date" and that "[t]he Board's discretion in this regard 'should not be disturbed.' " As to DiGregorio's request for a hardship license, the judge concluded that since the eight-year suspension had just begun to run, that request was premature.[8]

*Discussion.* 1. *Length of the revocation.* We begin by providing a quick road map to the applicable statutory provisions. Along with its neighboring sections, G. L. c. 90, § 24, governs the licensing consequences of driving while intoxicated.[9] With certain exceptions not here applicable, § 24(1)(*b*) requires the registrar to revoke the driver's license of anyone convicted of OUI in violation of § 24(1)(*a*)(1). This subsection does not itself specify how long the mandated revocation is to last. However, § 24(1)(*c*) serves to prohibit the registrar from restoring the driving privileges of the offender before a specified date. See *Breslin v. Board of Appeal on Motor Vehicle Liability Policies & Bonds*, 70 Mass. App. Ct. 131, 134 (2007). That date is determined by the number of previous convictions that the offender has had for OUI or "a like offense" (regardless of whether such convictions are in "a court of the commonwealth or any other jurisdiction"). See G. L. c. 90, § 24(1)(*c*), as amended through St. 2006, c. 428, § 13. Fifth-time offenders lose their privileges permanently. See G. L. c. 90, § 24(1)(*c*)(3 ¾).

Because DiGregorio's most recent OUI conviction was his

---

intensive therapy, and the board stipulated that it took no oral evidence at its hearing. See note 4, *supra.* In any event, the board did not determine that a revocation until January 5, 2016, was necessary because of public safety concerns, but instead concluded that a revocation of that length was mandated by the statute.

[8] As discussed *infra*, applications for hardship licenses cannot be filed immediately upon a license revocation.

[9] The registrar also has broad authority to suspend or revoke licenses on a case-by-case basis "whenever the holder thereof has committed a violation of the motor vehicle laws of a nature which would give the registrar reason to believe that continuing operation by such holder is and will be so seriously improper as to constitute an immediate threat to the public safety" (G. L. c. 90, § 22[*a*], as appearing in St. 1969, c. 637), or when the registrar "has reason to believe the holder thereof is an incompetent person to operate motor vehicles, or is operating a motor vehicle improperly" (G. L. c. 90, § 22[*b*], as appearing in St. 1969, c. 637). However, these provisions do not apply to licensing issues related to OUI violations. See G. L. c. 90, § 24(1)(*b*).

third such offense, the applicable provision here is § 24(1)(c)(3).[10] Under the express terms of that subsection, the registrar is prohibited from restoring the driving rights of a third time offender "until eight years after the date of conviction."[11] Notwithstanding this language, the defendants argue that the registrar's hands remain tied until eight years after she learned of the third conviction (which occurred here more than three years after the conviction), at least where the conviction that triggers the statutory provision occurs outside Massachusetts.

Statutory text is, of course, the principal source from which courts, and agencies, are to discern legislative purpose. See *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). "Where the words are 'plain and unambiguous' in their meaning, we view them as 'conclusive as to legislative intent.' " *Water Dept. of Fairhaven* v. *Department of Envtl. Protection*, 455 Mass. 740, 744 (2010), quoting from *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986). Courts must follow unambiguous statutory language "unless 'following the Legislature's literal command would lead to an absurd result, or one contrary to the Legislature's manifest intention.' " *Providence & Worcester R.R. Co.* v. *Energy Facilities Siting Bd.*, 453 Mass. 135, 142 (2009), quoting from *White* v. *Boston*, 428 Mass. 250, 253 (1998).

The defendants have not pointed to any ambiguity in the language of § 24(1)(c)(3); indeed, they pay virtually no attention to that language.[12] Instead, they focus on § 22(c), which states

---

[10]In its decision, the board (twice) cited to G. L. c. 90, § 24(c)(1)(2), a subsection that does not exist. As is evident from the context and from the statutory language quoted in the board's opinion, the board intended to cite G. L. c. 90, § 24(1)(c)(3).

[11]The defendants characterize this provision as establishing a mandatory eight-year term of revocation, and they seek to frame the question before us as determining when that eight-year period begins. Our dissenting colleague effectively does the same. However, that is not how the statute is structured. It does not set a minimum period of suspension; rather, it merely sets an end date by which the registrar is no longer prohibited from restoring one's driving privileges.

[12]Our dissenting colleague maintains, based on a hypothetical factual scenario, that our interpretion of the statute in accordance with its unambiguous language might lead to results contrary to the Legislature's intent. On this basis, he suggests that *Providence & Worcester R.R. Co.* v. *Energy Facilities Siting Bd.*, *supra*, allows us to interpret the statute as the registrar would prefer it to have been written. We respectfully disagree that the *Providence & Worcester R.R. Co.* case provides such license.

that upon receiving official notice of out-of-State violations, "the registrar shall give the same effect to said conviction for the purposes of said suspension, revocation, limitation or reinstatement of the right to operate a motor vehicle, as if said violation had occurred in the commonwealth." G. L. c. 90, § 22(*c*), as amended by St. 2006, c. 134, § 1. But DiGregorio does not question the registrar's authority to rely on the 2000 and 2004 Connecticut convictions once she received official notice of them or to treat these out-of-State convictions as if they had occurred in the Commonwealth. Section 22(*c*) simply does not speak to the question at hand: how long a suspension based on those convictions must last, regardless of whether they occurred in or out of State. That issue is addressed by § 24(1)(*c*)(3), not § 22.[13]

Even if we could deviate from the unambiguous language that the Legislature has enacted, the defendants have not presented any compelling reason to do so. Their principal argument is that relying on the date of conviction for out-of-State violations would create serious adverse policy consequences, because the registrar retains no control over the timeliness of the information that other States enter into the NDR system. Specifically, they suggest that relying on the "date of conviction" will allow hazardous drivers back on the road sooner or allow them to escape due

---

[13]The requirement that the registrar treat an out-of-State violation "as if said violation had occurred in the commonwealth," G. L. c. 90, § 22(*c*), could provide support for the registrar's interpretation (that the period begins when she receives notice and ends eight years later) only if late notice of an *in-State* violation would also toll the running of the revocation period. The registrar's receiving late notice of in-State convictions has historically been a problem (even if recent legislative and administrative modifications have at least partially ameliorated this). See *Brach* v. *Chief Justice of the Dist. Ct. Dept.*, 386 Mass. 528, 530-531 (1982) (discussing coordination problems between the court system and the registrar). A number of Superior Court cases cited by both parties have held that when the registrar is not provided timely notice of in-State convictions, the running of the revocation period is not tolled by the late notice, but instead remains keyed to the "date of conviction." In their brief, the defendants appear to concede that these cases were correctly decided, and they attempt merely to distinguish them on the basis that those cases involved in-State convictions. However, when pressed on the point at oral argument, the defendants took the position that those cases were not only distinguishable but incorrect (even though the defendants apparently chose not to appeal them). The defendants have not indicated what would allow the registrar to toll the running of the mandatory statutory revocation period when she receives late notice of an in-State conviction, and, in any event, that issue would turn on the meaning of § 24(1)(*c*), not § 22(*c*).

punishment. This argument ignores the maxim that "[w]here . . . the language of the statute is clear, it is the function of the judiciary to apply it, not amend it." *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651, 661 (2006), quoting from *Commissioner of Rev.* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999). We also note, however, that the record before us reveals that the state of interstate coordination is hardly as dire as the registrar (or the dissent) suggests.[14] For example, even though Connecticut did not post formal notice of the April 18, 2000, OUI conviction in the NDR database until 2007, the registrar's records indicate that Connecticut posted notice of its action suspending DiGregorio's driving privileges based on that conviction on May 24, 2000 (on, or directly after, the date that the suspension occurred). This information has thus been accessible to the registrar since that time.[15] When the registrar checked the NDR records in January of 2004, she learned of the 2000 suspension and immediately suspended DiGregorio's license effective February 15, 2004, on this basis. As a result, DiGregorio has been without his driving privileges continuously since February of 2004, and — absent the issuance of a hardship license — he is automatically prohibited from regaining them until October of 2012, a period of more than eight years.[16]

In light of the unambiguous language of the statute, we con-

---

[14]We do not mean to suggest that improvements could not be made to shorten the length of time between out-of-State OUI convictions and in-State revocations based on those convictions. Massachusetts is not powerless to address the tardiness of out-of-State officials. For example, the Legislature may wish to consider placing the onus on offenders to notify the registrar of out-of-State convictions or risk facing additional revocation time if they do not. But whether to modify the statute to provide for such fixes falls to the Legislature. See *Brach* v. *Chief Justice of the Dist. Ct. Dept.*, 386 Mass. at 538-539.

[15]Our factual conclusions rest entirely on the board's findings and the registrar's own uncontested records. For example, the registrar's records indicate the NDR entry that the registrar discovered in 2004 identified the 2000 Connecticut suspension as for "DRIV ALCOH/DRUG." This demonstrates that the registrar had actual notice of the 2000 OUI incident long before the conviction of that offense was posted.

[16]The board highlighted that DiGregorio continued to drive for some time notwithstanding his suspension, and it suggested that its ruling was based in part on its concern that DiGregorio could "avoid the eight-year penalty entirely." But to the extent that DiGregorio avoided any punishment for driving after his license was suspended on February 15, 2004, this has nothing to do with the registrar having inadequate revocation authority. Similarly, because

clude that the registrar is prohibited from restoring DiGregorio's license only until October 4, 2012, the eighth anniversary of his third OUI conviction. Our holding is narrow. We need not, and do not, decide the extent of the registrar's discretion to refuse to restore DiGregorio's license after October 4, 2012, in the event the registrar at that time considers him a menace on the road. Such questions are for another day.

2. *Denial of hardship license.* DiGregorio also seeks to challenge the board's declining to issue him a hardship license. The registrar urges us not to reach the issue on the ground that DiGregorio's request for a hardship license was premature even under his interpretation of the statute. Whether his request was premature cannot be definitively resolved on the current record.[17] For an additional reason that neither side has addressed, there is substantial doubt whether DiGregorio's request for a hardship license was ever properly before the board. Applications for a hardship license are to be filed with the registrar, and the applicant "shall be granted a hearing before the registrar." G. L. c. 90, § 24(1)(c). As with other licensing decisions of the registrar, one denied a hardship license can appeal that decision to the board. G. L. c. 90, § 28. However, "[t]he board has no independent statutory power to issue a license." *Breslin* v. *Bd. of Appeal on Motor Vehicle Liability Policies & Bonds*, 70 Mass. App. Ct. at 135. There is no evidence before us that DiGregorio

DiGregorio's license has been suspended continuously since February of 2004, our decision does not relieve him of a single day of suspension time compared to what he would have faced had the registry learned of his out-of-State October, 2004, conviction when it occurred.

[17]This question turns on what type of hardship license he was seeking. If he was seeking a general hardship license, then he would not have been eligible for such a license until October 4, 2008, a date that had not yet arrived by the time of the board's hearing. See G. L. c. 90, § 24(1)(c)(3) (third-time OUI offender can apply for a hardship license only "after the expiration of four years from the date of [the third] conviction"). If, alternatively, he was seeking a limited hardship license "for employment or education purposes," then he could have applied for such a license on October 4, 2006, a date that had passed by the time of the hearing. *Ibid.* DiGregorio maintains that his request that the board provide him a hardship license by way of alternative relief included a request for a limited license. Our review of the record does not resolve this conundrum, because there is no hardship license application in the documentary record, and a hearing transcript that might have answered what type of hardship license DiGregorio was seeking could not be produced. See note 4, *supra.*

ever actually requested a hardship license from the registrar. This may explain why the board never formally ruled on his hardship request.

In any event, DiGregorio has not shown that the board erred in denying him hardship relief. It is certainly true that having to hire a driver to get to work could amount to more than an "inconvenience" (the board found he was "inconvenienced" but did not suffer a hardship), especially where, as here, the board acknowledged that the applicant faced financial difficulties. However, Di-Gregorio has not pointed to any evidence in the record documenting the extent of the burdens he faced, such as, for example, what he had to spend on his driver and whether he could afford this. His arguments that the board erred in denying him a hardship license therefore would fail on the record here even if his request were properly before the board.[18]

*Conclusion.* For the reasons set forth above, we conclude that the judge erred in affirming the decision of the board insofar as the board ruled that DiGregorio's license revocation must by statute extend to January 8, 2016, rather than to October 4, 2012, the eighth anniversary of his third OUI conviction. Accordingly, the judgment is vacated, and a new judgment shall enter directing the board to revise its decision consistent with this opinion to order the registrar of motor vehicles to correct the termination date for the mandatory revocation of the plaintiff's license to October 4, 2012.

*So ordered.*

KANTROWITZ, J. (dissenting in part and concurring in part). Given my belief that the statutes at issue here have to be read in conjunction, I respectfully dissent.

There are two operative statutes at play, G. L. c. 90, §§ 22(*c*) and 24(1)(*c*)(3). Section 22(*c*), as amended by St. 2006, c. 134, § 1, provides, in pertinent part, that "[i]f the [Registrar of Motor Vehicles (registrar)] receives *official notice* . . . that a

---

[18]Nothing in our decision should be interpreted as preventing DiGregorio from filing a new application for a hardship license in accordance with procedures established by the registrar.

resident of the commonwealth . . . has been convicted in another state . . . the registrar shall give the same effect to said conviction for the purposes of suspension . . . of the right to operate a motor vehicle, as if said violation had occurred in the commonwealth" (emphasis supplied).

Once the notice specified in § 22(c) has been received, we turn to § 24(1)(c)(3) to ascertain what actions the registrar should take. The two statutes must be read together. Section § 22(c) triggers § 24(1)(c)(3). The majority seizes upon the phrase "eight years after the date of conviction" in § 24(1)(c)(3) to ascertain the end date for a license revocation. In the majority's view, as the language in § 24(1)(c)(3) is clear and unambiguous, the end date here is eight years after the defendant's third conviction of operating a motor vehicle while under the influence (OUI), which occurred in Connecticut.

Passing over the obvious — that nothing in c. 90, § 24, is ever clear and unambiguous[1] — how in this case could the registrar have acted if she was unaware, through no fault of her own, of the OUI convictions in Connecticut until that State officially placed those convictions in the national registry?[2] Further complicating the matter was the behavior of the defendant, who in addition to receiving license revocations in two States, also had his license revoked, as noted by the majority, in 2002 in Massachusetts due to a drug conviction. The board of appeal on motor vehicle liability policies and bonds (board) also found that "the Appellant was driving in Massachusetts throughout the time his license was suspended in Connecticut."[3]

The majority observes that the registrar apparently knew of the 2000 conviction. Even if that were so, the registrar did not

[1]"We start with the observation that wading through the various provisions of c. 90 is akin to driving a car without windshield wipers on a dirt road on the side of a mountain at night during a blizzard." *Commonwealth* v. *Chown,* 76 Mass. App. Ct. 684, 687, further appellate review granted, 457 Mass. 1107 (2010).

[2]General Laws c. 90, § 27, regulates the records of the courts of the Commonwealth and mandates that certain motor vehicle infractions be sent to the registrar. There is a stark distinction between State courts that do not follow the dictates of § 27 and foreign states. Massachusetts can control the former; it has no authority over the latter.

[3]The majority casts some doubt on this. See *ante* at note 4. As there is no transcript, it is somewhat difficult to conclude that the board somehow made this up.

know of the 2004 conviction until 2007. As the board wrote in its decision, "It is important to note that the Massachusetts Registry would not have known there was an OUI in Connecticut. The [National Driver Register] notification only advises Massachusetts that there is an unresolved offense in another state, and no license can be issued until the individual satisfies whatever requirements necessary."

Demonstrating the need for the two statutes (§ 22[*c*] and § 24 [1][*c*][3]) to work in concert, let us assume, for example, that the registrar first officially learned of the second Connecticut conviction nine years after the fact. In the view of the majority, there is no action the registrar could take under G. L. c. 90, § 24(*c*)(1)(3), as the eight-year revocation time period would have expired. This interpretation not only gives § 22(*c*) short shrift but ignores it entirely. What is the point of requiring notice under § 22(*c*), which triggers action pursuant to § 24(1)(*c*)(3), if the registrar upon receiving the notice is powerless to act? The majority also ignores the very principle that it recites, *ante* at 780, that courts must follow unambiguous statutory language "unless 'following the Legislature's literal command would lead to an absurd result, or one contrary to the Legislature's manifest intention.' " *Providence & Worcester R.R. Co.* v. *Energy Facilities Siting Bd.*, 453 Mass. 135, 142 (2009), quoting from *White* v. *Boston*, 428 Mass. 250, 253 (1998). Skipping over whether the result here is absurd, it certainly is contrary to the Legislature's manifest intention to protect its citizenry by keeping repeat drunk drivers off of its roads.

The ruling by the majority places the registrar in an untenable position and makes her obligation to monitor those convicted out-of-State of drunk driving difficult, if not impossible, to enforce. The decision places the registrar at the mercy of the posting dates of our sister States, over which Massachusetts has no control, and fails to take into consideration the dictates of § 22(*c*) and the purpose of the statutory provisions. For these reasons, I would affirm the decision below.