NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-571                                      Appeals Court

JAMES CUTICCHIA & others[1]  vs.  TOWN OF ANDOVER & others.[2]


No. 18-P-571.

Essex.      January 9, 2019. - April 3, 2019.

Present:  Milkey, Maldonado, & Kinder, JJ.


Municipal Corporations, Group insurance.  Insurance, Group,
    Premiums.  Public Employment, Retirement benefits.
    Retirement.  Statute, Construction.  Practice, Civil,
    Summary judgment.


    Civil action commenced in the Superior Court Department on
August 15, 2016.

    The case was heard by James F. Lang, J., on motions for
summary judgment.


    Harold L. Lichten for the plaintiffs.
    John Foskett (Ryan P. Dunn also present) for the
defendants.

_____

    [1] William Canane, Dennis Lane, and the Andover Educators
Association (which was granted leave to intervene).  For
convenience, we refer to the plaintiffs and the plaintiff-
intervener as "the plaintiffs."

    [2] Town manager of Andover and board of selectmen of Andover.

MILKEY, J.  In 2016, the town of Andover increased the percentage share that retired town employees had to pay for their health insurance.  Three retired town employees brought this action alleging that G. L. c. 32B, § 22 (e), prohibited the town from implementing such increases prior to July 1, 2018.[3]  On cross motions for summary judgment, a Superior Court judge ruled that the language of § 22 (e) unambiguously supported the town's position that the increases were lawful.  For the reasons that follow, we vacate the judgment.

1.  Statutory background.  A municipality may, but is not required to, provide health insurance coverage to its employees and retirees.  Somerville v. Commonwealth Employment Relations Bd., 470 Mass. 563, 564 (2015).  Where a municipality has chosen to provide such coverage, it generally has a variety of options regarding the percentage it will contribute towards the insurance premiums.  Although G. L. c. 32B, § 9, states that retirees are to bear the full cost of their health insurance, municipalities may elect to pay a share of those premiums by "accept[ing] the more generous provisions of G. L. c. 32B, § 9A or § 9E."  Id. at 565.  By opting into § 9A, the municipality can pay fifty percent of the premiums, and by opting into § 9E, they can pay a higher percentage.  Id.

_____

[3] The claim was brought as a class action, but it was dismissed before being certified.

In Somerville, the Supreme Judicial Court addressed the question whether a municipality that had elected to opt into § 9E could "unilaterally reduce[] its percentage contribution to retired employees' health insurance premiums without engaging in collective bargaining over the matter with current employees." Id. at 573. The court held that a town could do so, thus reaffirming that municipalities enjoyed broad statutory authority to raise the percentage share that retirees had to pay for their health insurance premiums. See id.

In 2011, the Legislature enacted a law to allow municipalities to pursue additional cost savings in the provision of their health insurance plans. See St. 2011, c. 69, § 3, inserting G. L. c. 32B, §§ 21-23 (2011 act). Specifically, municipalities now could elect to opt into a program through which they could redesign their health insurance plans, e.g., through changing the copayments and deductibles that those enrolled in the plans had to pay, and through adopting "tiered provider network copayments and other cost-sharing plan design features." G. L. c. 32B, § 22 (a). The 2011 act created a sui generis, streamlined process through which such changes were to be negotiated or, barring an agreement, determined by a specially constituted "municipal health insurance review panel." G. L. c. 32B, § 21 (c). While union representatives were given

an important role in that process,[4] the process otherwise by-passed ordinary collective bargaining.  See G. L. c. 32B, § 23 (a), (c), (g) (providing that decisions by municipality to redesign its health insurance plans are not subject to collective bargaining).

Notably, the new authority offered by the 2011 act was layered on top of the authority that municipalities already possessed to decrease the percentage share that they contributed to their retirees' health insurance premiums.  See G. L. c. 32B, §§ 9A, 9E.  This meant that retirees now potentially could be subjected to two types of increases implemented outside the traditional collective bargaining process:  increases to the percentage share that they had to pay for their premiums, and increases to their copays, deductibles, and the like.  As both sides agree, when the Legislature enacted the 2011 act, it placed temporary limits on the ability of municipalities to subject retirees to increases on both fronts.  Specifically, municipalities who elected to use their new authority to implement design changes to their insurance plans outside collective bargaining temporarily were precluded from using their already existing authority to raise the percentage share that retirees had to pay.  As Governor Patrick stated in

---

[4] See G. L. c. 32B, § 21 (b) (creating "public employee committee" comprised of union and retiree representatives).

proposing the language establishing this moratorium,[5] the purpose was "the protection of current retirees from short-term increases in premiums."  Governor's Message, 2011 House Doc. No. 3581.  Although the parties before us generally agree about the role that the moratorium was intended to serve, they disagree about the details as to how the moratorium was intended to operate and, most specifically, when municipalities would be relieved from its effects.

As enacted by St. 2011, c. 69, § 3, the moratorium language set forth in § 22 (e) reads as follows:

> "The first time a public authority implements plan design changes under this section or section 23, the public authority shall not increase before July 1, 2014, the percentage contributed by retirees, surviving spouses and their dependents to their health insurance premiums from the percentage that was approved by the public authority prior to and in effect on July 1, 2011."

In 2014, the Legislature amended this language by substituting "2016" for "2014."  St. 2014, c. 165, § 76.  In 2016, the Legislature again amended the language by substituting "2018" for "2016."  St. 2016, c. 133, § 45.  On both occasions, the remainder of the language was left the same.

---

[5] The amendment to G. L. c. 32B was originally proposed as an outside section of the fiscal year 2012 budget.  The Governor proposed the moratorium language in his statement returning certain outside sections of the fiscal year 2012 budget with vetoes and amendments.

2.  Background.  The town previously had elected to opt into § 9E, under which towns pay more than fifty percent of their retirees' health insurance premiums.  Specifically, as of 2011, the town was covering between sixty-five percent and eighty-six percent of those premiums.

In 2012, the town board of selectmen voted to make use of the statutory authority provided by the 2011 act so that the town could restructure the health insurance benefits it provided to its existing employees and retirees.  Following the procedures required by the 2011 act, the town implemented its first set of design changes to its health insurance plan effective July 1, 2012.  Those design changes, inter alia, included increased copays and deductibles that current employees and retirees alike would have to pay.  The percentage contribution that retirees would have to pay for their premiums was not changed at that time.[6]

In 2016, the town implemented a second set of design changes effective July 1, 2016.  At that time, the town also decreased the percentage contribution it would make to cover the premiums of its retirees (thereby increasing the share retirees had to pay).  Because the Legislature by this time had extended

---

[6] Both sides agree that a decrease in the town's percentage contribution would have been prohibited by the moratorium language included in § 22 (e).

the end date included in § 22 (e) to July 1, 2018, the plaintiffs challenged the 2016 increase to their percentage contribution as violating the moratorium.[7]  On cross motions for summary judgment, the judge ruled in the town's favor, explaining his reasoning in a thoughtful memorandum of decision. In short, the judge accepted the town's argument that under the plain language of § 22 (e), it could increase the percentage contribution that retirees would have to pay even prior to July 1, 2018, because the moratorium applied only to "the first time" a municipality implemented design changes to its health insurance plans, not to second or subsequent changes.  Although the judge recognized that the town's interpretation "imposes a very real financial hardship upon [retirees]," he concluded that it was compelled by unambiguous statutory text.  Relatedly, the judge concluded that the plaintiffs' interpretation would render superfluous the introductory language about "the first time" a municipality restructures its health insurance plans.  See Connors v. Annino, 460 Mass. 790, 796 (2011) (statute is to be construed "to give effect to all its provisions, so that no part

---

[7] The end date of the moratorium has not since been extended.  Accordingly, the parties agree that § 22 (e) does not prohibit increases to retirees' percentage contributions after July 1, 2018.  The controversy before us thus is limited to the period between July 1, 2016 (the date the challenged increases became effective) and July 1, 2018.

will be inoperative or superfluous" [quotation and citation omitted]).

3. Discussion. When discerning the intent of the Legislature, we, of course, must "begin with the language of the statute, and [w]hen a statute is plain and unambiguous, we interpret it according to its ordinary meaning" (quotations and citations omitted). Commonwealth v. Hanson H., 464 Mass. 807, 810 (2013). See DiGregorio v. Registrar of Motor Vehicles, 78 Mass. App. Ct. 775, 780 (2011) ("Statutory text is, of course, the principal source from which courts . . . are to discern legislative purpose"). However, "we look to the language of the entire statute, not just a single sentence, and attempt to interpret all of its terms 'harmoniously to effectuate the intent of the Legislature.'" Hanson H., supra, quoting Commonwealth v. Raposo, 453 Mass. 739, 745 (2009).

The key language of § 22 (e) states as follows:  "The first time a public authority implements plan design changes under this section or section 23, the public authority shall not increase before July 1, 2018, the percentage contributed by retirees . . . ."  The town's contention that this language is unambiguous has some force, especially if that language is read in isolation.  However, the town passes over the fact that the statutory text does not directly address what constraints may apply the second time a municipality implements plan design

changes; the town's interpretation relies on an inference that "the first time" means "but not the second or subsequent time." That inference is permissible, but not mandatory. Moreover, "meaning and ambiguity are creatures of context." Downer & Co., LLC v. STI Holding, Inc., 76 Mass. App. Ct. 786, 792 (2010). For the reasons set forth below, ambiguity emerges here when we examine the key language in the context of the statute as a whole.

It is uncontested that the moratorium set forth in § 22 (e) served to place temporary limits on the authority that municipalities already had to increase the percentage share that retirees would have to pay to cover their premiums. In addition, the § 22 (e) moratorium does not apply across the board to all municipalities, but instead applies only to those that have elected to make use of the new authority to redesign their health insurance plans outside the collective bargaining process. See G. L. c. 32B, § 22 (e). In light of this complicated structure, two questions naturally arise with respect to the timing of the moratorium: first, on what date does the moratorium first limit a municipality's ability to make use of its existing authority to increase the percentage contribution that retirees will have to pay, and, second, when does that limitation expire. In this context, the introductory language regarding "the first time" a municipality restructures

its health insurance plans readily can be interpreted as answering the first question. That is, the language of § 22 (e) can be interpreted so that the moratorium applies to a given municipality once that municipality has implemented design changes to its health insurance plans "the first time," and the moratorium expires on the date certain set forth in the statute (originally July 1, 2014, later extended to July 1, 2018).

This interpretation not only is consistent with § 22 (e)'s text, but also has the benefit of reading the various provisions in G. L. c. 32B as a harmonious whole. Under it, municipalities were informed that, if they chose to make use of their new authority to redesign their health care plans outside the scope of collective bargaining, their existing authority to raise the percentage contributions made by retirees would be limited temporarily until a date certain. See Ciani v. MacGrath, 481 Mass. 174, 178 (2019) ("Our principal objective is to ascertain and effectuate the intent of the Legislature in a way that is consonant with sound reason and common sense"). In contrast, under the town's interpretation, a municipality's authority would be tied to the happenstance of how many times the municipality chooses to implement design changes to its insurance plans. A municipality would be free to avoid the moratorium designed to protect retirees so long as it already

had implemented design changes that presumably had hurt them.[8]

Even if that interpretation were not considered absurd or

illogical, the legislative policy rationale supporting it is, at

a minimum, far from obvious.[9]

The town argues that its interpretation is compelled by the

Legislature's use of the term "the first time" elsewhere in a

related subsection.  See G. L. c. 32B, § 22 (b).  That

subsection draws an express distinction between certain

procedural requirements that apply only to "the first time" a

municipality implements the authority provided by the 2011 act

to redesign their health insurance plans, and those procedures

that apply "each time" it does so.  See id.  The town argues

that the use of the "the first time" language in § 22 (b) means

_____

[8] Moreover, under the town's interpretation, municipalities
would be free of the moratorium the second time they made
changes to their health insurance plans, regardless of the
extent and nature of the two sets of changes.  Thus,
municipalities would have been free to "game the system" in
order to avoid the moratorium, e.g., by making one set of design
changes to its health insurance plans, and then making technical
amendments to those plans while simultaneously raising the share
retirees must pay for their premiums.

[9] The town took the position that the language of § 22 (e)
was unambiguous, and argued that the plaintiffs had the burden
of showing that the town's interpretation plainly would be
contrary to the manifest intent of the Legislature.  See, e.g.,
Reade v. Secretary of the Commonwealth, 472 Mass. 573, 584
(2015) (rejecting argument that receipt of any veterans'
benefits renders party "indigent," notwithstanding that literal
reading of relevant statutory language provided support for that
position).  As a result, the town did not attempt to explain how
its own interpretation made sense.

that we must attribute the same meaning to the Legislature's use of the same language in § 22 (e).  See Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd., 457 Mass. 663, 695-696 (2010) ("Words used in one part of a statute to connote a particular meaning should be given the same meaning in another part of the same statute" [quotation and citation omitted]).

The flaw in the town's argument is that interpreting the moratorium language in the plaintiffs' favor does not depend on ascribing different meanings to "the first time" language used in the two sections.  Rather, in § 22 (b) and § 22 (e), the meaning of the term "the first time" is identical; it appears plain that, in both instances, the Legislature used these words in the ordinary manner to refer to the date that the municipality initially made design changes to its health insurance plans (in reliance on its new authority to implement such changes outside the collective bargaining process).  The key question is not what the phrase "the first time" means, but what legal consequences were intended to attach to it based on how the phrase specifically is used in each section.  Under the plaintiffs' interpretation of § 22 (e), the date a municipality first uses the authority provided by the 2011 act marks when the moratorium first applies; under the town's, that date marks both the first time and the last time that the moratorium applies.

The plaintiffs' interpretation is significantly more plausible. Cf. Leighton v. Hallstrom, 94 Mass. App. Ct. 439, 447 (2018) (rejecting interpretation under which certain legal consequences "were so evanescent as to vanish as soon as they were created").

None of this is to suggest that the plaintiffs' interpretation flows easily from well-crafted statutory text. But the sentence structure that the Legislature chose to employ renders both competing interpretations awkward at best.[10]  Our mandate is "to give ambiguous, imprecise, or faultily drafted statutes 'a reasonable construction,' with the primary goal of 'constru[ing] the statute to carry out the legislative intent,'" and to "avoid[] a construction which would negate legislative intent or defeat its intended utility" (quotation and citations omitted).  Bartlett v. Greyhound Real Estate Fin. Co., 41 Mass. App. Ct. 282, 286 (1996).

When the language of § 22 (e) is considered in the context of the statute as a whole, the plaintiffs' parsing of the language is no less natural than that of the town.  Had the Legislature plainly intended its temporary curtailment of

---

[10] It often has been observed that "people who love sausage and respect the law should never watch either one being made" (a quote of uncertain provenance that has been attributed variously to Mark Twain, Otto von Bismarck, and several others).  The same comparison might also be made about looking too closely at the end product, not just the process.  No matter how toothsome and nourishing a sausage may be, its appearance often falls short of ideal.

municipal authority to terminate on "the earlier of" July 1, 2018, and the date on which the municipality implements its second set of design changes to its health insurance plans, it would have been easy to say so. See Peters v. United Nat'l Ins. Co., 53 Mass. App. Ct. 775, 783-784 (2002) (rejecting party's interpretation of statute because, "had the Legislature desired to create such a system, we believe it would have said so with considerably greater clarity").

We finally consider the parties' competing claims about whether available legislative history supports or undercuts their respective interpretations. See Commonwealth v. Deberry, 441 Mass. 211, 215 (2004), quoting Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 435 (2002) ("Where the statutory language is not conclusive, we may 'turn to extrinsic sources, including the legislative history and other statutes, for assistance in our interpretation'"). The parties agree that if resort to legislative history is appropriate, then the statement made by Governor Patrick when he sponsored the moratorium language would be a valid source to consider. See Commonwealth v. Peterson, 476 Mass. 163, 168 (2017) (where resort to legislative history is appropriate, courts may consider and give weight to Governor's sponsoring statement). However, the Governor's 2011 statement that the moratorium was intended to protect "current retirees from short-term increases

in premiums" is consistent with both interpretations, and therefore provides little assistance in choosing between them.[11]

For their part, the plaintiffs highlight legislative history related to the 2016 amendment to § 22 (e), which extended the moratorium end date from July 1, 2016, to July 1, 2018.  See St. 2016, c. 133, § 45.  They argue, with at least some force, that during the floor debate on that bill, at least one key proponent of the bill and one key opponent both appear to have understood that the 2016 amendment would extend the moratorium for another two years, without any hint that municipalities might avoid the moratorium simply by making design changes to their health insurance plans a second time.[12]

---

[11] The town argues that a moratorium that would have lasted seven years (from 2011 to 2018) cannot be considered as providing merely "short-term" protections.  But under the language on which the Governor was commenting, the moratorium was to terminate as of July 1, 2014.  Especially given inevitable time lags incumbent in a municipality's adoption and then implementation of the authority provided by the 2011 act, the moratorium originally was slated to be in effect at most for only approximately two years (a period that easily could be considered "short-term").

[12] During the floor debate in the Senate, the sponsor of the 2016 amendment to § 22 (e), Senator Thomas McGee, stated that the amendment "extends until June 30, 2018 the protection for those municipal retirees and survivors that was put in place in 2011."  Amendment 91 Relative to Municipal Retiree Fairness, Senate Floor Debate, May 24, 2016.  Meanwhile, during the floor debate in the House, the lead opponent of the amendment, Representative Jim Lyons, explained that he opposed the change because its effect would be that municipalities could "no longer control the costs they want to control."  State House News Service (House Sess.), June 30, 2016.  Notably, Representative

In addition, the plaintiffs point out that Governor Baker vetoed the two-year extension of the moratorium end date and, in a statement accompanying that veto, explained that "I am vetoing this section because the section would take away, for an additional two years, one of the few tools a city or town has to control both its health insurance costs and its liability for other post-employment benefits."  Attachment B to Governor's Message, 2016 House Doc. No. 4505.  In the face of Governor Baker's unqualified statement about the broad effects of the two-year extension, the Legislature overrode his veto.

The parties engage in a vigorous debate about whether it is appropriate to take into account the various comments made with respect to the 2016 amendment to § 22 (e) and, if so, how much force to attach to them.[13]  For present purposes, it suffices to

Lyons was from Andover, and he focused his comments on the town's reliance on the anticipated termination of the moratorium in 2016.

[13] The parties dispute the extent to which courts can look to comments made by individual legislators (as opposed to official committee reports and the like).  Compare Boston Sewer & Water Comm'n v. Metropolitan Dist. Comm'n, 408 Mass. 572, 578 (1990) ("Statements of individual legislators as to their motives concerning legislation are an inappropriate source from which to determine the intent of legislation"), with Rodman v. Rodman, 470 Mass. 539, 545 n.9 (2015) (looking to comments made by individual legislators as part of "floor debate" on bill for clarification).  In addition, the town argues that it is inappropriate to rely on the comments made with respect to the 2016 legislation, because the key "the first time" language was enacted in 2011 and left unchanged by the 2016 legislation.  See Massachusetts Comm'n Against Discrimination v. Liberty Mut. Ins.

say that nothing in the legislative history contradicts the plaintiffs' interpretation, and that what is available, if anything, provides some support for that interpretation. We do not place conclusive, or even significant, weight on the legislative comments that the plaintiffs have brought to our attention.

4. Conclusion. For the reasons set forth above, the judge erred in concluding that § 22 (e), as amended by St. 2016, c. 133, § 45, allowed the town to increase its retirees' proportionate share of their health insurance premiums prior to

_____

Co., 371 Mass. 186, 194 (1976) ("[T]he views of a subsequent [Legislature] form a hazardous basis for inferring the intent of an earlier one"). But while the 2016 Legislature did not change the particular language on which the town seeks to rely, it did otherwise materially amend the sentence in which that language is embedded; indeed, the plaintiffs are relying on the 2016 amendment as what prohibits the town from raising their percentage share. Under these circumstances, some argument can be made that comments reflecting the views held by the 2016 Legislature regarding the consequences of its actions are relevant. See Briggs v. Commonwealth, 429 Mass. 241, 256 (1999) (recognizing that in some "circumstances it is appropriate for us to respect [legislative] expression concerning the earlier enacted statutory amendments").

With regard to what import to place on the Legislature's enactment of the 2016 amendment to § 22 (e) over Governor Baker's veto, the town points out that the Supreme Judicial Court has cautioned against reading too much into such a fact in a case broadly analogous to the one presented here. See Kobrin v. Gastfriend, 443 Mass. 327, 336 n.10 (2005) (where Governor vetoed bill based on his view that statutory provision was too broad, fact that Legislature enacted statute by overriding that veto "does not assist us in identifying where the line should be drawn").

July 1, 2018.  We therefore vacate the judgment and remand this matter to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.